# THE WASHINGTON MARKET COMPANY

*v.*

# CLAGETT.

MARKET-HOUSES; NEGLIGENCE; ACTUAL NOTICE; AGENCY; PRACTICE; AMENDING VERDICT.

1. Where a woman entering a market-house in the afternoon, by an entrance at which there was a covered door, which was in one piece and swung from its center on a pivot, thus preventing her from seeing where she was going, slipped on a pile of fish beside a fish stall in the aisle leading from the door, and was thrown to the ground and injured; and in an action by her against the market company and lessee of the stall, it appeared that the company had no actual notice of the presence in the aisle of the fish, which had fallen there from a barrel delivered at the stall about fifteen minutes before the accident occurred, but that there had been no inspection or patrol of the fish aisle after 9 o'clock, A. M., by either of two day watchmen employed by the company, it was not error for the trial court to charge the jury that it was the duty of the market-house company to maintain a reasonably sufficient and efficient force of watchmen to patrol the aisle so as to keep it in a safe condition for the public, and failure to do so would be negligence on its part such as to entitle the plaintiff to a verdict against the company.

2. Under such circumstances, the question of actual notice to the market company is not material, and the right of the plaintiff to recover does not depend upon proof of such notice; but conceding that notice is an essential element in the right of the plaintiff to recover, the principle will apply that having the means of knowledge and negligently remaining ignorant is equivalent, in creating a liability, to actual knowledge.

3. Where a market company charged with the duty of keeping the aisles of its market-house free from obstructions dangerous to the patrons of the market, requires the lessees of its stalls to keep the adjoining aisles free from such obstructions, the company will be liable for the negligence of the lessees in failing to do so; the lessees, as between the company and third parties, being regarded as the com-

pany's agents; the maxim, *qui facit per alium facit per se*, applying under such circumstances.

4. Where, in an action against joint tort-feasors, the verdict as delivered by the jury is that they find for the plaintiffs " and that the money payable to them by the defendants is the sum of $1,000, to wit, $500 by each of the defendants," the trial court can correct the irregularity either by amending the verdict by striking out as surplusage all after the finding of the joint liability, that is to say, after the $1,000, leaving the verdict to stand for that amount, or return the verdict to the jury for correction, requiring them to return a verdict without attempting to apportion the payment as between the defendants.

No. 1110.   Submitted October 11, 1901.   Decided November 5, 1901.

HEARING on an appeal by the defendants from a judgment entered upon a verdict for the plaintiffs in an action by husband and wife to recover damages for personal injuries to the wife.                    *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Frederick D. McKenney* and *Mr. J. S. Flannery* for the appellant, The Washington Market Company:

1. The Washington Market Company is not an insurer of the safety of persons using the aisles of its market-house, and was entitled to notice, either actual or constructive, of the presence of the fish, before it could be held liable for the injury sustained by the female plaintiff. *District of Columbia* v. *Woodbury,* 136 U. S. 463, 464. The responsibility of the Washington Market Company, the owner of the market building, leasing to its tenants certain spaces bordering upon the aisles of said market-house for the purpose of vending various food products and articles of merchandise, and requiring such tenants to keep the aisles around their stalls clean and free from obstruction, is analogous to that of a municipality which is charged with the supervision of the sidewalks of a city upon which stores, warehouses, and private residences abut. *District of Co-*

*lumbia* v. *Payne,* 13 App. D. C. 500; *District of Columbia* v. *Woodbury, supra.*

If the market company should be held to the more stringent rule of accountability applicable to owners or lessors of buildings, for injuries sustained therein while such buildings are occupied by tenants, it would still be entitled to notice of the existence of a defect in or the presence of an obstruction upon its premises before it could be held liable to respond in damages. *Bennett* v. *Railroad Co.,* 102 U. S. 580; *Albert* v. *State,* 66 Md. 325; *State* v. *Bashe,* 73 Md. 469. The officers and agents of the market company not only had no notice whatever of the fish being in the aisle, but the time during which the fish were permitted to remain there by the servant of Moreland & Company — the short space of ten or fifteen minutes — would not be sufficient to impute notice to the market company. Generally when a defect has existed for a day or less, notice will not be implied. 15 Am. & Eng. Encyc. of Law, 480. Nor is an hour or two considered sufficient notice. *Butler* v. *Oxford,* 69 Miss. 618; *Stoddard* v. *Winchester,* 154 Mass. 149; *Theissen* v. *Belle Plaine,* 81 Iowa, 118. Nor will fifteen minutes impute notice. *Chapman* v. *Macon,* 55 Ga. 566; *Sikes* v. *Manchester,* 59 Iowa, 65. The existence of an unsafe condition for from ten to twenty minutes is not sufficient to charge the owner with knowledge. *Frassi* v. *Mac-Donald,* 122 Cal. 400. The rule requiring notice of a defect is more strictly applied in cases where, as in this, the unsafe condition is the result of the negligent act of a third person not in the employ or directly under the control of the municipality or the owner of the premises. *Hume* v. *City of New York,* 47 N. Y. 639–646; *Johnson* v. *Milwaukee,* 46 Wis. 568; *Fort Wayne* v. *De Witt,* 47 Ind. 296; *Huntingdon* v. *Breen,* 77 Ind. 29.

2. There was no allegation in the declaration of the plaintiffs that the corps of watchmen or the patrol maintained by the market company was insufficient, and there was absolutely no evidence in the case from which the jury could find that the force of watchmen was inadequate.

Even if there had been any justification for such an instruction in the pleadings or proof adduced in support thereof, the charge of the court would still be erroneous, because it submitted to the shifting, uncertain, and capricious decision of a jury the legal liability of the market company in the premises. This court and the Supreme Court of the United States have time and again condemned the practice of allowing juries to decide what precautions should be observed, appliances made use of, or agents employed.in the conduct of a lawful business. *Railroad Co.* v. *Adams,* 10 App. D. C. 97; *Delaware Railroad Co.* v. *Converse,* 139 U. S. 469–473.

3. While it is not contended on behalf of the appellant, the Washington Market Company, that the first verdict rendered by the jury was not defective in that it attempted to apportion damages against both defendants, it is insisted that the trial justice committed grave error in commenting upon the form of that verdict and stating in the presence of the jury that "I suppose, however, the verdict is practically one for $1,000.  *  *  *  The verdict the jury no doubt intended to render against the defendants was against both of them jointly in favor of the plaintiffs without any distinction as to which should pay it."

After the jury had plainly indicated by the verdict which they rendered in the first instance that they considered the Washington Market Company liable to respond in damages only to the extent of $500, such comment by the court, assuming as it did that they intended to find against such defendant in the sum of $1,000, was in effect a direction to the jury to retire and render a verdict in accordance with his assumption. By this action of the court the damages assessed against the Washington Market Company were doubled.

4. The court also erred in accepting the second verdict, which had been rendered after the jury, on the previous afternoon, had agreed upon their verdict, sealed it up, and separated for the night. It is very plain from the discussion over this verdict which took place at the trial that

the jury were not directed by the court simply to retire and reform their verdict, but they were specifically directed to retire, consider what their verdict should be, and bring in a new verdict against one or both defendants.   The court said to them:

"Gentlemen, you may retire and *consider what your verdict shall be*.   If you find a verdict against both defendants return a verdict for a single sum in favor of the plaintiffs without saying which of the defendants should pay, as you have undertaken to do."

There was no appearance for the appellant Grunewald.

*Mr. Henry E. Davis, Mr. Charles Cowles Tucker,* and *Mr. Edward B. Kimball* for the appellee:

1. There is no force in the contention that there is an analogy as to the question of notice between the case of a municipal corporation and that of a private corporation, such as the appellant, the Washington Market Company. No authority for such contention is produced and none exists.   The general principles of the law governing the case are clearly and sufficiently set forth in the following cases: *Smith* v. *London, etc., Co.,* L. R., 3 C. P. 326; *Sweeney* v. *Old Colony RR. Co.,* 10 Allen, 368; *Carleton* v. *Franconia, etc., Co.,* 99 Mass. 216; *Bennett* v. *Railroad Co.,* 102 U. S. 577.   And there being no rule of law as to what constitutes negligence in such cases, the court properly left that question to the jury in its charge.

2. There is no force in the objections to the action of the court in respect to the receipt of the verdict.   The court distinctly said in the presence of the jury that it did not instruct the jury how it should find, but left that matter wholly to the jury; and, on the jury's coming in after the amendment of the verdict, it was polled, and each juror assented to the verdict.

In this there was no error.   28 Am. & Eng. Encyc. of Law, 365.

Mr. Chief Justice Alvey delivered the opinion of the Court:

This was an action instituted by the appellees, Mrs. Emma L. Clagett and Maurice J. Clagett, her husband, against the appellants, the Washington Market Company and Frederick L. Grunewald, surviving partner of the late firm of W. M. Moreland & Company, to recover for personal injuries sustained by the female plaintiff, occasioned, as · it is alleged, by the joint neglect of the defendants, while the plaintiff was attending a market, on December 2d, 1898.

It is alleged, and shown in proof by admission, that the Washington Market Company, at the time of the occurrence of the injury complained of, was a body corporate, organized and operated under the laws of the United States, and was in possession and control of the market-house and premises, in the city of Washington, known as the Center Market, extending from Seventh street west to Ninth street, and from B street north to Pennsylvania and Louisiana avenues in said city: That said market company rented or leased stalls or stands in the market-house to divers persons for market purposes, but retained a general supervision over the building, and over all the aisles and corridors thereof.

It appears that, at the time of the accident, the Center Market had four main aisles running east and west from Seventh to Ninth street, and a number of side aisles running at right angles to the main aisles. The most southerly of the four main aisles, that on the side of the market-house nearest to B street, was known as the " fish " aisle. These aisles were entered from the outside of the market-house by means of or through blind or double doors, which were constructed in one piece, without any glass in them, and swung on a pivot in the center, one side of the door · opening inwardly as the other side opened outwardly. These doors were eight or nine feet wide, and occupied nearly the whole width of the small or cross aisles.

It also appears that Moreland & Company were fish, game, and poultry dealers, and leased from the market com-

2

pany eleven stalls, which were situated in the "fish" aisle, in the south wing of the market-house, between doors Nos. 16 and 19, and on both sides of door No. 17. These stands were used by them for selling and storing fish, and the fish was generally delivered and taken in through doors Nos. 17 and 18, which were in the center of their stalls.

It being the duty of the market company to superintend and to keep in proper and safe condition the market-house and all its aisles and corridors, it employed for the purpose of patrolling the premises and keeping things in order, four watchmen, two for day and two for night service, besides a certain number of sweepers. It was the duty of these watchmen to maintain a constant patrol of the aisles of the market-house, and every part of it, while the market was open; but it would seem from the testimony that there was no inspection or patrol by these watchmen, or any of them, of the "fish" aisle, where the accident occurred, during the day, after about 9 o'clock, A. M., of December 2d, 1898. The market-house was open every week day, but the regular days were Tuesdays, Thursdays and Saturdays. The fishmen were required by the market company to do their own cleaning up around their stands, and Moreland & Company employed a colored man for that purpose. Fish brought into the market-house for dealers was deposited in front of the benches or stalls, the tops removed from the barrels, the fish taken out and laid in boxes and iced down. Most of the fish was delivered early in the morning, but some of it was received during the market hours, and packages of fish coming by express were delivered up to 12 o'clock in the day. The watchmen employed by the market company were accustomed to permit the stall-owners to deposit boxes or barrels of fish or other articles in the aisles only long enough to enable them to unpack and put the contents in their proper places.

The plaintiffs lived in the country, and on the day of the accident, according to the testimony of the female plaintiff, she had occasion to go into the city and to the Center Market therein to do some marketing; that when she reached

the market-house, somewhere between 1 and 3 o'clock, P. M., she attempted to enter the market-house by door No. 17 on B street; that this door was covered with black cloth or leather, and was in one piece, swinging from the center on a pivot; that as she attempted to enter the door there was no way of seeing where she was going; that she had entered through the various entrances a great many times before; but that, on this occasion, as she went up the step and started to go into the door — " just as soon as I got in the door — my foot slipped from under me and I was thrown to the ground. I slipped on some fish — a pile of them — that were in the aisle, right next to the stall, just on the right-hand side towards Seventh street." She was, as she says, thrown to the ground,— the floor of the aisle being composed of stone or marble — and she was severely hurt.

By another witness, an employee of Moreland & Company, testimony was given, though his estimate of time would seem to be very indefinite, that about half-past 12 o'clock on Friday, December 2d, 1898, and about fifteen minutes before the accident happened, a barrel of fish had been brought in, and, by some means or other, it had been upset, and some of the fish and some of the ice were turned out in the aisle, just at the inside and in the way of the opening of the door, No. 17; that he saw the female plaintiff in the act of opening the door and stepping in, and that he called to her to mind or she would fall, but he could not say that she heard him; that he saw her fall, and he helped to get her up and to place her in a seat.

The witness further says that he had seen the fish and ice on the floor in the aisle a short time before the plaintiff came in, but he was engaged at the time and did not stop to take them up; but he picked them up after the accident happened. It is not shown that any of the watchmen employed by the market company had knowledge of the fact that the fish and ice had been turned out of the barrel and remained in the aisle, prior to the happening of the accident; though the evidence tends to show that neither of the watchmen had been in the " fish " aisle later than 9 o'clock, A. M., of that day.

At the close of the plaintiffs' case the market company requested the court to direct a verdict in its favor, but that request was refused; and the defendants, resting the case upon the evidence offered by the plaintiffs, then offered several prayers for instruction* as to the law, which were all refused, and in lieu thereof the court charged the jury upon the entire case. To this charge exceptions were noted to parts thereof by the defendants; but upon examination of the entire charge we find nothing therein that could afford the defendants any just ground of exception. The charge

---

* **Prayers offered by defendant and rejected by the trial court:**
1. The jury are instructed that the defendant the Washington Market Company is not an insurer against accidents happening in the aisles of its market-house, nor is it liable for obstructions placed in such aisles by persons not in its employ or under its immediate control, unless it had notice of the presence of such obstructions. This notice may be either actual or constructive, the latter meaning that the market company, being under an obligation to exercise a general supervision of the aisles of its market-house and to keep itself reasonably informed about their condition, if an obstruction liable to cause accident remains in such aisles so long that said market company, in the exercise of ordinary care and diligence, could not help knowing that such obstructions existed, then the law imputes notice to it. In other words, it is notice in contemplation of law, and that is constructive notice.

2. And in this connection the jury are further instructed that the mere presence of an obstruction in one of the aisles of the market-house for from ten to twenty minutes does not itself necessarily impute notice to the market company. The law does not require impossibilities of any person, natural or artificial, and it is impossible that all parts of the aisles of such a market-house should be under constant inspection. Consequently, it cannot be presumed that at the instant an obstruction is placed in or upon one of such aisles the market company is charged with notice thereof and is to be held liable for any accident happening therefrom if it does not cause it to be instantly removed. Every such case must be determined by its peculiar circumstances. The market company would not be liable to respond in damages for injuries sustained in an accident caused by an obstruction in or upon one of the aisles of its market-house unless actual notice was brought to it of the presence of such obstruction or unless such obstruction had existed for so long a time that said market company would necessarily have known of its presence had ordinary and reasonable care been exercised.

3. If the jury shall find from the evidence in this case that from fifteen to twenty-five minutes before the accident in question happened

throughout was most favorable to the defendants; and as showing the manner and scope of the inquiry submitted to the jury, we shall incorporate herein the parts of the charge excepted to by the defendants.

After explaining to the jury the nature of the case, the questions involved, and how they should be examined with respect to the evidence, the court proceeded in its charge to say:

" The duty of a party who has such an establishment as that, and the duty of the defendant the Washington Market

---

a barrel containing fish consigned to the defendant Moreland & Co. was by an agent of an express company brought in through door No. 17 of the market-house for delivery to Moreland & Co., and was by him deposited upon the floor of said market-house in front of a stall of said Moreland & Co., and that about five minutes later said barrel was placed behind one of the stands or stalls of said Moreland & Co. near to said door, and that later the barrel was in some way overturned and several of the fish contained therein fell upon the aisle of the market-house near to and in front of said door No. 17, and that within ten minutes thereafter the plaintiff, in entering said door, stepped upon one of the said fish and was thereby caused to fall and received the injuries complained of, the jury are instructed that notice of the unsafe condition of the passage-way cannot be imputed to said market company, nor can said market company be held to be guilty of negligence, as matter of law; and the jury is further instructed that there is no evidence in this case that said defendant market company had actual notice of the presence of such fish; and without notice, either imputed or actual, of the presence of such obstruction, the market company cannot be held liable in this action.

4. While it is the duty of the defendant the Washington Market Company to keep the aisles of the market-house in a safe condition for persons lawfully using said market-house, yet if such aisles are rendered unsafe by the negligent act of a third person not in the employ of said defendant or directly under its control, said defendant the Washington Market Company is not responsible for damages resulting therefrom unless it had knowledge of such unsafe and insecure condition of said aisles or unless said unsafe and insecure condition had existed for a sufficient length of time for said defendant to have obtained knowledge thereof by the exercise of reasonable care and caution.

5. The jury are instructed that there is no evidence in this case from which they can find that the defendant the Washington Market Company did not maintain a proper and sufficient supervision of the aisles of its market-house on the occasion of the accident.— REPORTER.

Company, being the owner of the property and leasing it
to the various persons for the purpose of carrying on this
business, reserving to itself the right and the duty of keep-
ing the aisles and corridors open and free to the customers
and patrons of the market at that place, would be to preserve
its character of safety; that is to say, they must ·not per-
mit any accumulations of anything to remain in these aisles
or corridors which are detrimental to and unsafe·to the cus-
tomers who may resort there — the patrons of the institu-
tion. In that respect they are to exercise due care and
diligence — reasonable care and diligence — such as ordi-
narily prudent persons would exercise with reference to
their own safety and the safety of others. That responsi-
bility the law places upon them by reason of their position
as the owners of the property, leasing it to individuals for
the purposes of traffic and the sale of articles kept there for
sale, to which the public are invited to go for the purpose
of making purchases.

" Now, there is some controversy between counsel in re-
gard to the rule to be applied by the jury and by the court in
understanding and determining the liability of the Wash-
ington Market Company — as to what their duty was. It
was their duty, gentlemen, as I have said, to maintain the
aisles and corridors of that place so as to make it reasonably
safe for the public to visit there, and in doing that they are
to exercise ordinary care and diligence. Now, what is ordi-
nary care and diligence should be determined by you from
all of the circumstances and surroundings developed by the
evidence in relation to the situation there as to what it was
necessary for them to do, how much of a patrol it was neces-
sary for them to maintain, and whether or not the number
which the evidence may show were retained there and kept
there for the purpose of patrolling the aisles and corridors
was, in your judgment, such a force as would be fairly and
properly sufficient in that situation,— the situation the evi-
dence may show the market-house to have been in at that
time. You should determine whether it was sufficient and
reasonable, such as could reasonably be required of the mar-

ket company with reference to the exercise of ordinary care and prudence. If you find that there was such a patrol, such a watch, as ordinary care and prudence would seem to require, then the Washington Market Company would not be liable. It would not be subject to a charge of negligence.

" I may stop right there, however, and say that there is no evidence of any actual notice (I believe I am right in that) to the Washington Market Company prior to the accident. I repeat, however, gentlemen, that if you find that the force which the evidence shows was maintained there as a patrol force for the purpose of watching the corridors and aisles and keeping them open and clear for pedestrians and customers who resorted there was sufficient and reasonable under the circumstances, then you need not go any farther, as far as the Washington Market Company is concerned; but as to it your verdict should be for the defendant, the market company. But if you find, gentlemen, taking into consideration the situation and all the circumstances which are developed by the evidence as to what you may find from the evidence necessary to be done by the market company in the way of maintaining a patrol so as to make it safe, that they failed to provide an efficient and sufficient force to insure that result, then if you find that the female plaintiff was in the exercise of reasonable care and used reasonable diligence in reference to her own safety, then, so far as the market company is concerned, the plaintiff will be entitled to a verdict. As to the other defendant, you will look to the evidence for the purpose of determining whether they had the opportunity, had the notice, had the knowledge of this dangerous material — the fish — knowing that it was in the way of this entrance and this aisle, and that they neglected and did not use due care and diligence to take it away, out of the way of pedestrians coming in at that door; and if you find that the female plaintiff came into the door and, in the exercise of ordinary care on her own part for her own safety, trod upon the fish and fell and was injured, the defendant, who is here as a partner of the firm of Moreland & Company, would be liable to a verdict."

The foregoing is the part of the charge to which exception was taken by the defendants. As will be observed, the charge as it applied to the Washington Market Company was restricted, and the liability of that company was made to depend upon the question, whether it had provided and kept in the market-house such a patrol force as was reasonably required for watching and keeping clear and safe the aisles and corridors of the building; and if it had so provided, there was no liability on the part of the market company, and the verdict should be in its favor. It was not, therefore, the question of the neglect and inattention of the patrol force employed, according to the charge, but the question of its actual nonsufficiency to do the work, that was made the ground of liability. This restriction, however, certainly afforded no ground for exception to the defendants.

There is no doubt of the general proposition of law, that the grantee of a franchise to maintain a market, and who takes toll for his own benefit, incurs an obligation to maintain the market in a state and condition reasonably fit and safe for the purpose for which the franchise was granted; and if he erects or allows an obstruction to exist, which causes danger and injury to persons who frequent the market, he is as much liable as one who does so on a highway. *Lax* v. *Darlington*, 48 L. J. Q. B. 143, affirmed on appeal, L. R., 5 Exch. Div. 28.

That there was negligence in the case, on the part of some one acting for Moreland & Company, in allowing the fish and ice to be turned out in, and to remain on the floor of the aisle, can admit of no question. It was clearly the duty of the Washington Market Company to keep the aisles and corridors of the building free from all obstructions and danger to those invited to visit and patronize the market. The proof shows that the fishmen having stalls in the market, were required by the market company to do their own cleaning up around the stalls, and that Moreland & Company employed a colored man for that purpose. If the duty primarily incumbent upon the market company was, by that company, imposed upon the lessees or licensees of its stalls, the com-

pany would be liable for the negligence of such lessees or licensees; for the latter, as between the company and third parties, would be regarded as the company's agents, and the maxim *qui facit per alium facit per se* would apply. The company could not relieve itself of liability for the unsafe condition of these aisles, by imposing the duty of keeping them safe and free from obstruction upon its lessees or licensees of the stalls in the building. The latter's negligence in that respect would be the negligence of the company.

It would seem to be clear that the invitation that was held out to the public to visit and deal at the market was of a nature to assure every one that he or she could go into the market-house by the ordinary ways provided without incurring danger or risk to life or limb. It was the duty of the market company to guard against danger to their patrons, and if, by reason of the unsafe condition of the premises, an injury to a patron be sustained, without fault on his part, the *onus* is upon the market company to show that it could not, by the exercise of reasonable care by those for whose acts and omissions it was liable, have prevented the accident.

Judge Cooley, in his work on Torts, pp. 604–607, says, that when one " expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit." And in the leading English case of *Indermaur* v. *Dames,* L. R., 1 C. P. 274, and 2 Id. 511, where the question was fully considered as to the rights of persons who, upon invitation, either express or implied, visit premises upon business which concerns the owner or occupier, the court said "that it was settled law that a visitor of that class, using reasonable care on his part for his own safety, is entitled to expect that the occupier shall, on his part, use reasonable care to prevent damage from unusual danger which he knows *or ought to know;* and that, where there is evidence of neglect, the question whether such

reasonable care has been taken, by notice, lighting, guarding, or otherwise, and whether there was contributory negligence in the sufferer, must be determined by a jury as a matter of fact."

That case, and many other cases involving the same principle, were cited and quoted from with approval, by the Supreme Court of the United States, in a very elaborate and clear opinion delivered by Mr. Justice Harlan, in the case of *Bennett* v. *Railroad Co.,* 102 U. S. 577, 582. Indeed, the principles laid down by the Supreme Court in this latter case would seem to be entirely conclusive of the present.

The appellants contend, however, that it was incumbent upon the plaintiffs to show affirmatively that the defendant, the Washington Market Company, had actual notice of the existence of the obstruction in the aisle by the spilling of the fish and ice, before the accident occurred, to entitle the plaintiffs to recover against that company. But we think the question of actual notice to the parties representing the market company, *in view of the facts of this case,* is not material, and the right of the plaintiffs to recover does not depend upon the proof of such notice. If, however, it be conceded that notice was an essential element in the right of the plaintiffs to recover, the principle would apply that, *having the means of knowledge, and negligently remaining ignorant, is equivalent, in creating a liability, to actual knowledge.* This is the principle that was laid down in the House of Lords, upon great consideration, in the case of *The Mersey Docks* v. *Gibbs,* 11 H. L. Cas. 687, 701, and which has been quoted with approval by the Supreme Court, in the case to which we have already referred, of *Bennett* v. *Railroad Co., supra.*

In the opinion of Mr. Justice Blackburn, delivered in the House of Lords, in behalf of all the judges, and in which the House concurred, in speaking of the question of notice as to the existence of a dangerous obstruction in the entrance to the dock, it was said: "For a body corporate never can either take care or neglect to take care, except through its servants; and (assuming that it was the duty of the trustees

to take reasonable care that the dock was in a fit state) it seems clear that if they, by their servants, had the means of knowing that the dock was in an unfit state, and were negligently ignorant of its state, they did neglect this duty and did not take reasonable care that it was fit." And so in this case, the Washington Market Company had the means of knowledge, and if it did not avail itself of such means, its omission was negligence by its servants or agents, for which it was liable. But, as we have said, in view of the undisputed facts in this case, the fact of actual notice to the market company was not essential to the plaintiffs' right to recover.

In view of the whole case, and of the principles we have stated, we perceive no ground whatever upon which a reversal of the judgment can be claimed. The case was submitted to the jury in a most favorable manner to the defendants; and upon the restricted ground which the market company was held liable, according to the charge of the court, the jury must have found that the market company had failed to provide a sufficient force to patrol and keep the aisles and corridors of the building clear and in a safe condition. And, upon that supposition, the question of notice would, in any aspect of the case, become quite immaterial.

With respect to the question that was raised as to the form of the verdict as originally rendered, we perceive no merit in the objection taken to it. The verdict as delivered was that the jury " find said issues in favor of the plaintiffs, and that the money payable to them by the defendants is the sum of $1,000, to wit: $500 by each of the defendants." The jury simply undertook the inadmissible thing of making an equal apportionment of the amount of the verdict to be paid as between the two defendants. This they could not do. They had found the amount of the joint liability to be $1,000, and they had nothing to do in apportioning the payment between the defendants. The verdict as a whole was irregular and informal. But it would have been competent for the court to have received the verdict and amended it by striking out, as surplusage,

all after the finding of the joint liability, that is to say, after the $1,000, leaving the verdict to stand for that amount; that being the manifest intention of the jury as to the amount of their joint finding. But it was equally competent to the court to pursue the course that was pursued, that of returning the verdict to the jury for correction. We perceive no error in what was done. 28 Am. & Eng. Encyc. of Law, 365.

It follows from what we have said that the judgment should be affirmed; and it is so ordered.

*Judgment affirmed.*