**AVERY et ux. v. CITY OF PORT ARTHUR et al. (No. 1150.)**

(Court of Civil Appeals of Texas. Beaumont. Nov 19, 1924.)

**1. Death ⬅33—Individual liable for individual acts causing death.**

Individual was liable in 1920, under Vernon's Sayles' Ann. Civ. St. 1914, art. 4694, for his individual acts of negligence resulting in death.

**2. Death ⬅33—No cause of action for death caused by agents of individual in 1920.**

In 1920 there was no valid statute giving cause of action for. actual damages for injuries resulting in death, caused by negligence of agents or servants of individual.

**3. Bridges ⬅39(5)—Individual held not relieved of liability for death resulting from his own negligence in maintenance of bridge, under contract with city, because latter was not liable for death from its negligence.**

Individual, contracting with city to maintain bridge in safe condition, held not relieved of liability for death from injuries caused by his own negligence, because death statute then in force did not subject city to liability for death resulting from its negligence.

**4. Bridges ⬅46(4)—No presumption of lawful operation of bridge by individual under permission of federal government.**

That bridge across navigable stream was built and operated by permission of federal government gave rise to no presumption that one operating it under contract with city, without automatic gate, bells, or gongs, or sufficient and proper lights, when raised for passage of boats, was operating it lawfully in such respects.

**5. Bridges ⬅46(8) — Contributory negligence of occupant of automobile, driven into river from approach to raised bridge, held for jury.**

Contributory negligence of one drowned, when automobile in which she was riding was driven at night into river off unguarded and insufficiently lighted approach to bridge, raised for passage of boats without warning of fact, held for jury.

**6. Bridges ⬅46(8)—Negligence in failing to maintain automatic gate, bells, lights, etc., held for jury.**

Whether failure of one operating bridge to maintain automatic gate, bells, gongs, red light, or other safety device, when raised for passage of boats, constituted negligence, held for jury, in action for death of occupant of automobile driven into river; they being personal acts or omissions, as distinguished from his agent's negligence in not switching on, or repairing defects in, automatic lights.

**7. Bridges ⬅35—One returning from pleasure pier operated by person operating bridge thereto held invitee, to whom latter owed duty of maintaining bridge in safe condition and warning of latent perils.**

One returning in automobile from pleasure pier, operated by one, who also operated bridge, constituting sole way of approach and departure, held not trespasser on bridge, volunteer, nor mere licensee, but invitee, to whom latter owed duty to maintain it in reasonably safe condition and give warning of latent or concealed perils in bridge or its approaches, known to him, and not to invitee.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Action by A. B. Avery and wife against the City of Port Arthur and C. E. Dunstan. Judgment for defendants, and plaintiffs ap-

---

peal. Affirmed as to city, and reversed and remanded as to individual defendant.

Howth & O'Fiel, of Beaumont, for appellants.

C. A. Lord, of Beaumont, and Wistner & White, of Port Arthur, for appellees.

WALKER, J. On the 8th day of April, 1920, and for many years prior to that date, appellee C. E. Dunstan was operating a pleasure pier on Sabine Lake across the Port Arthur Ship Channel from the city of Port Arthur. The usual and customary, and possibly the only, way to reach this pier was by a bridge built by the city of Port Arthur across the ship channel, and then over a shell road, about three-quarters of a mile to the pier. The street car company also operated its cars across this bridge, and by the side of the shell road, to the pier. Foot and vehicle traffic also used the bridge. The bridge and road were originally built by the city of Port Arthur, but for most, if not all, of the time that Dunstan had been operating the pier, he had held the bridge and road under a written contract from the city, by the terms of which he was to operate the same in accordance with government regulations, and to keep them in suitable repair for the use for which they were constructed; that is, for the benefit of the public. Dunstan operated the pier as a means of monetary gain, inviting the public to his place of business and affording them various means of amusement, such as are usually found at pleasure resorts, and his purpose in operating and maintaining the bridge and road was to afford the public a ready, safe, and convenient access to his place of business.

The bridge was a lift bridge operated by an electrical device and a heavy counter weight, by means of which it could be raised to a perpendicular position when raised for the accommodation of vessels using the canal; and after these vessels passed under the bridge it would be lowered to its piers, thus affording a continuous passage across the canal connecting the pier end of the road with the streets which approached the bridge from the city. When raised, the bridge rested on the city side of the street, thus blocking the way into the canal from that side, but leaving the pier side of the canal open and exposed, with no guard or protection of any kind against one driving or walking into the canal. However, until about two weeks prior to the date above mentioned, Dunstan had maintained and operated an automatic gate, built into the road on the pier side of the bridge, that would rise out of the road when the bridge was raised, and then would sink to the level of the road when the bridge was lowered to its place on its piers. It appears that this gate had rotted out. When this bridge was in operation, one could not drive or walk into the canal from the pier side

without running over the gate. The bridge was also equipped with lights that would flash on automatically when the bridge was raised, but would be automatically extinguished when the bridge was in place. It was also equipped with a red bull's-eye light that had not been burning for some days prior to the date mentioned. On the night of April 8th, none of the lights on the bridge were burning. The bridge was not equipped with gongs or bells, or any other device to give warning to the public using it that it was being raised, though some effort had been made to install bells or gongs on the bridge, which was not successful, because the bell or gong used was too small.

On the night in question, the only light about the bridge that was burning, and the only device of any kind or character to warn one of the presence of the bridge, was a small stationary electric light at the base and on the pier side. On dark, cloudy, or rainy nights, when in a raised position, the bridge could not be seen by those proposing to use it until it was almost reached. Without the automatic gate, the bridge was described by one witness as a "death trap." Dunstan did not operate the bridge in person, but committed this duty to a servant, whose duty it was to raise and lower the bridge on proper signals from ships using the canal, and to see that the automatic lights would burn, but it was not his duty to equip the bridge and its approaches with any kind of safety device. Dunstan was fully advised as to the condition of the automatic gate, the need for the gong or bell, the condition of the bull's-eye light, but there is no suggestion that he knew that the other automatic lights on the bridge would not burn. On being asked why he did not keep the lights on the bridge burning or in condition, the servant at one time said that it was all he could do to "get his money." While the issue was raised that no lights at all were burning on the bridge on the evening of the 8th of April, the issue was raised that they burned that afternoon and the next morning.

On the evening of the day in question, Miss Ruth Avery, and a young lady friend, who lived in Beaumont, and two gentlemen escorts, drove from Beaumont to Port Arthur and spent the evening at Dunstan's pleasure pier, dancing at times in the dance hall, and enjoying themselves in the customary and usual manner. As did all the other guests at the pier, this party used the bridge and shell road above described in reaching the pier, and in returning from the pier. At about 11 p. m. this party left the pier, intending to return to Beaumont by the same route they had traveled in going. They were all four riding in a one-seated automobile, and all four of them were sitting on the one seat, talking in a friendly way as they approached the bridge. There

was no suggestion that they were drinking, noisy, or conducting themselves other than in an orderly manner. They saw the small stationary light as they approached the bridge, and, knowing that they were near it, slowed down the car to about 10 miles per hour, so they could cross in safety. They could not see the bridge as they approached it, because the night was dark and cloudy, and it was threatening rain.

As already said, the automatic gate was not in operation, and, there being no device to warn them that the bridge was raised, and not being able to see it in its raised position, and not knowing that it was raised, they drove their car along the road until it fell into the open canal, with the result that Miss Avery was drowned. The other members of the party escaped, and the record does not show the extent of their injuries, if any, though there is a suggestion in the record that at least one of them has a suit pending for damages growing out of the accident. Miss Avery was about 16 years old at the time of her death, and this suit was brought by her parents against the city of Port Arthur and C. E. Dunstan for damages growing out of her death. They pleaded the facts of the accident and laid the proper predicate as a measure for their damages, which they predicate on the negligence of defendants in failing to maintain the automatic gate, or bells, or gongs, or lights, or some other safety device to give warning that the bridge was in a raised position, and that the way into the canal was open and unguarded.

Our statement of the case has support in the evidence offered by appellants, which, to some extent, was controverted by appellee Dunstan, but, since this is an appeal from an instructed verdict, it is not necessary to give his version of the facts.

The city of Port Arthur answered by general demurrer and certain special pleas which need not be mentioned, since its general demurrer was sustained, and appellant, though excepting, here concedes that the ruling was proper, saying:

"The plaintiffs had joined the city of Port Arthur as one of the defendants along with said Dunstan, and by plea of abatement, as heretofore stated, the said city had already been properly dismissed by the court as one of the defendants, inasmuch as the statute then in force, regulating recovery of damages for death, did not include municipal corporations. City of Dallas v. Halford (Tex. Civ. App.) 210 S. W. 725."

Appellee Dunstan answered by general demurrer, general denial, and certain special pleas involved in his counter propositions, which will not be set out in detail.

On conclusion of the evidence, on a trial between appellants and appellee Dunstan,

the trial court instructed a verdict in favor of appellee, from which appellants have duly prosecuted their appeal. Their assignments and propositions relate to this action of the court, on the theory that certain issues of actionable negligence were raised by the evidence and should have been submitted to the jury. Appellee's counter propositions, which involve his special pleas, are as follows:

"(1) At the time of the accident in question in this suit, which occurred in the year 1920, there was no valid statute in this state giving a cause of action for actual damages for injuries resulting in death caused by the negligence of an individual.

"(2) At the time of the accident in question in this suit, which occurred in the year 1920, there was no valid statute in this state giving a cause of action for actual damages for injuries resulting in death caused by the negligence of the agents or servants of an individual.

"(3) The appellants predicated their case upon the allegation in their petition that the city of Port Arthur had deliberately removed the weights from the gate in question, which caused the injuries to, and the death of, Ruth Avery; the city of Port Arthur was not liable as a matter of law for an injury resulting in death caused by its negligence; and the appellee C. E. Dunstan would not be liable because of the negligent act of the city of Port Arthur, and the appellants base no liability as against the appellee C. E. Dunstan upon any negligent act of the city of Port Arthur. It follows that no act of negligence charged against the appellee C. E. Dunstan could have been the direct and proximate cause of the injury complained of, and that the negligent act charged against the City of Port Arthur was the proximate cause of the injury as alleged by the appellants in their petition, or that, in any event, such act would prevent any of the negligent acts alleged against the appellee C. E. Dunstan from being the direct and proximate cause of the injury complained of.

"(4) The appellants allege in their petition that the defendants had raised the bridge and left the highway open, and had failed and neglected to place any lights at said place, so that persons approaching said crossing could detect the danger, and that they sounded no bell or gong such as would stop travelers approaching the bridge. They allege that, under these conditions, their daughter and her associates drove the automobile into such dark place. The evidence conclusively and absolutely shows that the deceased was well acquainted with the location of the bridge, and that she was an especially bright and very precocious young lady, and the evidence conclusively and absolutely shows that as the automobile in which the deceased was riding approached this bridge, alleged to be dark, so that it could not be determined whether the bridge was raised or lowered, the deceased made no objection whatever to proceeding, and that she spoke no word in that connection. It follows as a matter of law that she was guilty of negligence in going into such a dark and dangerous situation, knowing the conditions as she did, and she herself could therefore not have recov-

ered damages; consequently her parents cannot do so under the statutes of this state."

### Opinion.

[1] Appellee's first counter proposition is not well taken. Notwithstanding the unconstitutionality of certain features of the death statute as amended in 1913, being article 4694, Revised Civil Statutes, it has been held, in Anderson v. Smith (Tex. Civ. App.) 231 S. W. 142, Moss v. Koetter (Tex. Civ. App.) 249 S. W. 263, and Schaff v. Merchant (Tex. Civ. App.) 250 S. W. 466, that an individual under that act was liable for his individual acts of negligence resulting in death. The history of this legislation was reviewed by Judge Smith of the San Antonio Court in Oberstone v. Armendariz (Tex. Civ. App.) 244 S. W. 644. The Supreme Court denied writs of error on these holdings, and we could add nothing further to the discussion by undertaking to review the grounds upon which this proposition rests. So in this case we hold that appellee Dunstan was liable for his individual acts of negligence proximately resulting in the death of Miss Avery.

[2] The second proposition is well taken, under the authority of Rodgers v. Tobias (Tex. Civ. App.) 225 S. W. 804, and decisions following it. This defect in our statutory law was later remedied by additional legislation.

[3, 4] The third proposition is not sound. While appellee Dunstan is correct in saying that the city of Port Arthur was not liable, yet the relation between him and the city was not such as to relieve him of liability on account of his own negligence. He had contracted with the city to keep and maintain the bridge in a safe condition, and was therefore bound to do so. There is no suggestion in the evidence that the government required Dunstan or the city to remove the automatic gate, or to refrain from installing bells or gongs, or from maintaining sufficient and proper lights on the bridge when in a raised position. True, the bridge, being across a navigable stream, was built and operated under permission of the federal government, but we cannot agree with appellee that a presumption arose in his favor that he was operating the bridge in a lawful manner as to the respects named, merely on the ground that the bridge was built and operated by government permission.

[5] We dispose of appellee's fourth counter proposition by saying that the contributory negligence of Miss Avery was one of fact, and not of law. The issue was clearly raised that she and her companions were exercising due care for their own safety as they approached the bridge.

[6] Under this discussion of appellee's counter propositions, it follows that the court erred in giving a peremptory instruc-tion in his favor, if there was evidence of personal negligence on his part proximately causing the death of Miss Avery. In this connection, we must, of course, under the Tobias Case, discard all acts of negligence committed by his agent. This holding takes out of the case all negligence in failing to switch on such automatic lights as were in repair and all defects in the lights under the charge of the agent not known to Dunstan. If these lights were in repair, or if their condition was attributable to the acts of the agent, Dunstan could not be charged with the failure to operate them. But the failure to maintain the automatic gate, bells, gongs, the red light, or other safety device, did not come within the scope of the Tobias Case, and were personal acts or omissions on the part of Dunstan himself.

[7] The issue as to whether they constituted negligence must be determined by a jury, under instructions defining his duty to Miss Avery. He says he did not—

"owe the deceased any duty to provide a bridge. Under the law, she took the bridge as she found it. She knew the laws of the United States with respect to its waterways, and she was charged with such knowledge just as much as the appellee was, and she could not complain that the city of Port Arthur and the United States government had not worked out a bridge plan structure that would be absolutely safe for her to use as a part of the highway."

If this were a sound legal proposition, appellee owed Miss Avery only the duty of ordinary care to operate the bridge in its then condition. And, as it was being operated by a servant, the default, if any, would have been that of the servant, for which he would not have been liable. But Miss Avery was not a trespasser on the bridge and road; nor was she a volunteer · nor was she a mere licensee. She was clearly an invitee, there as a guest, patron, and customer of Dunstan's business, using the way of approach to his business maintained by him for her accommodation and convenience, and over which it was necessary for her to travel. The following rule is announced in 26 R. C. L., under the subject "Theaters, Shows, etc.," § 14, where it is said:

"In accordance with the well-settled rule that an owner or occupant of lands or buildings, who directly or by implication invites or induces others to go thereon or therein, owes to such persons a duty to have his premises in a reasonably safe condition, and to give warning of latent or concealed peril, one who maintains a public resort or place of amusement is required by law to keep it in a reasonably safe condition for those who properly frequent the place. Where the public is invited to attend it is the duty of the one who so invites to exercise all proper precautions, skill, and care commensurate with the circumstances to put and maintain the place and every part of it in a reasonably safe condition for the uses to

which it may rightly be devoted. A failure to comply with this duty may be negligence; and, for an injury proximately caused by the negligence, the negligent party may be liable in damages, if the party injured is not guilty of contributory negligence. If the proprietor neglects his duty to keep the premises in a safe condition so that the property is in fact unsafe, his knowledge or ignorance of the defect is immaterial."

While the bridge was not immediately connected with the pleasure pier, it was operated as a part thereof and in connection therewith. So we think section 51, under the subject of "Negligence," 20 R. C. L. 55, has application:

"The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings, who directly or by implication invites or induces others to go thereon or therein, owes to such persons a duty to have his premises in a reasonably safe condition, and to give warning of latent or concealed perils. In the language of a recent opinion: 'The law is well settled that an owner or occupant of land, who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose, is liable for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him, and not to them.'

"If there are hidden dangers upon the premises, he must use ordinary care to give warning thereof. While the rule has been applied in innumerable situations, it has been invoked most frequently, perhaps, in the case of injuries from unguarded excavations, unprotected stairways, hatchways, trapdoors, turnstiles, revolving or swinging doors, and collapsing buildings. The facts of the particular case are, of course, controlling upon the question of negligence, and the decision thereon is properly within the sphere of the jury." Selinas v. Vermont State Agricultural Society, 60 Vt. 249, 15 A. 117, 6 Am. St. Rep. 114; Calvert v. Springfield, etc., 231 Ill. 290, 83 N. E. 184, 14 L. R. A. (N S.) 782, 12 Ann. Cas. 432; 20 R. C. L. § 52, p. 57.

"It is when the perilous instrumentality is known to the owner or occupier, and is not known to the person injured, that the recovery is permitted. In the language of Mr. Justice Harlan, the owner is liable to invited persons for injuries "occasioned by the unsafe condition of the land or its approaches, if such condition was known to him, and not to them, there was negligence sufficient to exist without timely notice to the public or to those who are likely to act upon such invitation." Bennett v. Louisville Ry. Co., 102 U. S. 577, 26 L. Ed. 235.

Our own Supreme Court said, in Stamford Oil Co. v. Barnes, 103 Tex. 409, 128 S. W. 375, 31 L. R. A. (N. S.) 1218, Ann. Cas. 1913A, 111:

"Those who used premises to transact business thereon with the public invite the public to come and deal with them, and hence owe to those accepting the invitation the duty of using ordinary care to make reasonably safe for their use the. place or places assigned to such use."

We believe all acts of negligence pleaded by appellants, except those attributable to the acts of the agent operating the bridge, should have been submitted to the jury. Therefore it is our order that the judgment of the trial court sustaining the demurrer as to the city of Port Arthur be affirmed, but that the judgment as to appellee Dunstan be in all things reversed, and, as to him, this cause be remanded for a new trial.