## STEWART *v.* WASHINGTON & GREAT FALLS ELECTRIC RAILWAY CO.*

RAILROADS; NEGLIGENCE; DIRECTION OF VERDICT.

1. In operating a double track railroad the owner is bound by no rule that requires that he shall use the right-hand track for the running of cars in one direction and the left-hand track for running of cars in the reverse direction; but he may run his cars on both tracks in either direction as the needs of the business may require.

2. Where an employee of one of several street railway companies which used a car-barn just outside of the city limits, which could be reached only by means of the right of way along which double railway tracks were laid, while on his way early in the morning, before light, to the barn to report for duty was injured by being struck by a car having a headlight, approaching him from the rear while he was walking on the left-hand track, and it appeared that, although the space between the tracks was wide enough for a person to walk in, its surface was rough, it was held that the trial court in an action brought by him against the company operating the car properly directed a verdict for the defendant, although the plaintiff testified that he had never known the left-hand track to be used in the running of cars.

No. 1300. Submitted October 15, 1903. Decided November 4, 1903.

HEARING on an appeal by the plaintiff from a judgment of

*Railroads—Personal Injury.*—As to liability for injuries to persons walking on tracks, see the presentation of authorities in the following editorial notes: Care required of railroad company to prevent injury of small children on track, note to *Bottoms* v. *Seaboard & R. R. Co.* 25 L. R. A. 784; failure to maintain lookout for persons on track, note to *Smith* v. *Norfolk & S. R. Co.* 25 L. R. A. 287; duty of railroad company as to trespassers, notes to *Cincinnati, I. St. L. & C. R. Co.* v. *Cooper*, 6 L. R. A. 241; *Toomey* v. *Southern P. R. Co.* 10 L. R. A. 139, and *Daniels* v. *New York & N. E. R. Co.* 13 L. R. A. 248.

the Supreme Court of the District of Columbia upon a verdict of
a jury directed by the court in an action to recover damages for
personal injuries.                                    *Affirmed.*

The COURT in the opinion stated the case as follows:

This was an action instituted by the appellant, Belton D.
Stewart, against the appellee, the Washington and
Great Falls Electric Railway Company, to recover
damages for injuries received, alleged to have been
caused by the negligence of the appellee. The appel-
lant was struck and run over by a moving car on the road tracks
of the appellee, and thereby severely injured, while he was walk-
ing on the railroad tracks. Upon the evidence produced at the
trial, the case was taken from the jury by the instruction of the
court, upon the ground that the evidence was legally insufficient
to warrant a verdict for the plaintiff. The latter excepted and
took an appeal to this court.

The evidence shows the accident to have occurred on the
morning of December 19, 1900, about the hour of 20 minutes to
6 o'clock, at a place outside the city limits, and where there were
no public streets or highways either crossing or running near the
railroad tracks. The defendant company is the owner of the
Washington and Great Falls Electric Railway, the eastern ter-
minus of which is at the corner of Thirty-sixth street and Pros-
pect avenue, Washington city, and running thence west and
north to Cabin John Bridge, beyond the city limits. The road
runs along Prospect avenue west until it reaches and crosses the
city limits. It has a double track its entire length. About 900
to 1,000 feet west of Thirty-sixth street, and outside the city
limits, there is a car barn belonging to the defendant company,
which, at the time of the accident, and for some time prior there-
to, had been used in common by the defendant, the Metropolitan
Railroad Company, the Georgetown and Tennallytown Com-
pany, and Georgetown and Rockville Company, for the purpose
of storing cars when they were not in use. Many cars of each of
these companies were stored during the nighttime in this barn.

VOL. XXII—32

The barn did not furnish room for all the cars that were necessary to be left in that vicinity over night, and when there were more than could be stored in the barn it was customary to leave them on the tracks about the barn over night, and many of the cars were thus left, during the night, parked on the west-bound track of the defendant's road between the barn and a bridge that is some 300 feet east of the barn. It is shown to have been the habit or custom, for some time prior to the accident, for the employees of the several railroad companies, that ran their cars from the barn, to go along Prospect avenue to the bridge, then cross the bridge and go to the barn upon the right of way of the defendant company. The tracks between the barn and the end of the bridge are 6 feet and 8 inches apart, leaving room for a person to walk between them, with a car passing on either track. The evidence shows that the space between the tracks at that place was suitable to walk on, but was not so smooth or convenient as the eastbound track, which had been filled in and leveled off.

On the morning of the accident, as had been the custom for some time before, cars were parked on the west-bound track from the barn nearly to the bridge, and it had been customary for some time before for the cars leaving in the early morning to run east to Thirty-sixth street, and then run back to the barn on the same track, and then shift over to the west-bound track by means of a switch constructed for that purpose. According to the testimony of the motorman of the car that collided with the plaintiff, on the morning of the accident he left the barn with his car somewhere about 5.30 on the east-bound track, and he had to return from Thirty-sixth street on the same track because there were cars stored on the west-bound track between the bridge and the barn. The cars were stored on that track from near the barn nearly down to the bridge,—within 50 feet of the bridge, says the witness.

At the time of the accident the headlight of the car was burning; and it is not shown or pretended that either the sense of sight or hearing of the plaintiff was defective. He could have seen the approaching car, if he had looked, when it was 350 feet.

away from him. He was familiar with the ground that he was passing over, and with all the environment. He, moreover, must have known that it was about time for the return of the car from Thirty-sixth street. It does not appear that any other cars were moving at the time between the barn and Thirty-sixth street. The plaintiff, without either looking or listening, stepped from the space between the tracks on to the east-bound track of the road and was immediately struck and run over by the passing car, and thereby injured. The plaintiff had been employed by the various companies using the barn for several months prior to the time he was hurt; and, on the morning of the accident, he was going to the barn to take out a car on the Georgetown and Tennallytown road.

The motorman of the car, who was produced as a witness for the plaintiff, testified that he was looking ahead of the car, but it being dark he could not see the plaintiff until he stepped from between the tracks onto the track in front of the car, and into the light of his headlight; and when he did that he shouted to him and stopped the car as quick as he could, but the car struck and injured him before it could be stopped. That the car was going at the time of the accident at the rate of from 6 to 12 miles an hour. That when the witness shouted to the plaintiff, which was some three or four seconds before the car struck him, the plaintiff seemed to pay no attention whatever to the alarm.

The plaintiff testified that he did not know, nor observe that morning, that cars were standing on the west-bound track so as to prevent a car going west on that track, and never had observed it prior to that time; though the evidence shows that he had been going to that barn every morning and taking out a car for a period of two or three months. He says that when he reached Thirty-sixth street and Prospect avenue that morning, the car which subsequently struck him was standing there, having gone out from the barn and reached that station before the plaintiff did; but he passed it and thought it was going down town, and therefore thought it would be safe for him to walk west on the east-bound track; though this does not seem to be exactly consistent with his further statement that he had never known a

car to be propelled along the left-hand track going either east or west. He says that he "had been reporting at the barn to take out a car for two or three months prior to the time he was hurt; and during that time he had never known of the left track being used on that part of the road that he was traveling, going either east or west." He testified to his getting on the track where he was hurt, and in regard to which fact, he says: "He walked down the railroad track and crossed the bridge in the center, because the bridge is planked between the two tracks and is floored all the way across between the rails. On the other side of the bridge the witness crossed to the east-bound track going into Georgetown, or the left-hand track in the direction that he was going, and walked up the track. He was then struck by something and did not remember anything more after crossing onto the left-hand track. Witness did not hear anything before he became unconscious, and does not, of his own knowledge, know what struck him."

In regard to the condition of the space between the two tracks where the plaintiff was hurt, as to making it necessary to go upon the track, the plaintiff in his testimony, says: "Between the two tracks from the trestle out to the barn there were stubs that the surveyors had driven in there, in surveying the road and putting in the west-bound track. There were stubs driven in along up there (pointing to the places on the plat), and running up to the barn, and there were old cross-ties thrown there between the rails. It was not *convenient* to walk up through those stubs and over those cross-ties in the morning and in the dark, and we all used the track, which was smooth because it had been filled level with dirt, and was level with the top of the cross-ties, and made a smooth surface." In response to the question whether he could walk up between the two tracks, he said: "Yes, we *could* do it; but you could not walk on the south side of the south track, as the bank came right on to the track, and there is a cut along there."

This is about the substance of the evidence that has any material bearing in the case, or that has any tendency whatever to support the case stated in the declaration. As we have stated,

the case was taken from the jury, because of the insufficiency of the evidence to support a verdict for the plaintiff.

On the assignment of error by the appellant, two questions are raised: 1. Whether there was such evidence of negligence on the part of the defendant company as required that the court should have submitted the case to the jury; and, 2. Whether the evidence established such a case of negligence, or contributory negligence, on the part of the plaintiff, as would defeat his right to recover for the injury complained of? If the first of these questions be determined in the negative, the second becomes immaterial to be considered.

*Mr. Charles Cowles Tucker,* for the appellant:

1. There was evidence of negligence on the part of the appellee. It owned and controlled the car barn or shed at which its own men and those of the other companies using the barn by its permission, about thirty in all (and all of them but those of one of the companies, the Metropolitan, under the charge of its division superintendent, Ballinger, and night clerk, Kerns), were required to report every morning, a majority of them at five o'clock. Presumably the appellee was compensated by the other companies for their use of the barn and for the services of Ballinger and Kerns. The barn was accessible to these thirty men only by means of the appellee's tracks between the barn and the city. They necessarily used the tracks to reach the barn every morning, and the appellee necessarily had knowledge of such use. Such use was not merely permissive on the part of the appellee, but was one of the conditions entering into the employment of the men, who were furnished by the appellee with no other and safer means of reaching the place where they were required to report for duty than over its tracks and right of way. The appellee was charged with knowledge of the danger in the use by the men of the tracks, and owed a duty to them to avoid so running cars as to jeopardize their safety. The appellee's duty in this regard was somewhat similar to that of a railroad company towards its track-repairers, and cases will be hereafter cited

showing what that duty is.    The appellee was also charged with knowledge of the physical condition of the right of way and tracks.    It knew, or should have known, if it had any regard for the safety of the men, that west of the trestle was a cut, the sides of which were so near the tracks and so high that the men necessarily had to walk on the tracks or in the space between the inner rails of the tracks, and also that this space was so filled with surveyor's stubs and old cross-ties that it could not safely be used as a passageway, if, indeed, it would have been any safer than either of the tracks, in view of the side projections of passing cars.    Charged with the duty mentioned towards the men who were required to use the tracks to get to their place of employment at an hour when it was as dark as midnight, and with knowledge of the danger incident to the use by them of the tracks, the case presented by the appellant, so far as the negligence of the appellee is concerned, is:   Was it (1) negligence on the part of the night clerk or foreman of the appellee to direct the motorman of the car which struck the appellant to depart from a custom which had prevailed at least during the time of the employment of the appellant by the several companies using the barn, a period of eleven months (and which every one knows to be a universal custom in this country, although not in England) of running the cars along the right-hand track, and to use the left-hand track in making his return trip from Georgetown, without taking steps to notify the men who would be using the tracks, of such intended departure, or at least requiring added care and vigilance to be used in the running of the cars in this unusual manner in the early morning when the men were on their way to the barn ?   (2) Was it negligence on the part of appellee to change its schedule, according to which its first car left Georgetown at 5.30 on its westward trip, so as to make it leave on the arrival of the first car from the East Washington barn, which car usually arrived eight or ten minutes later than the time mentioned, without notifying the men, who were required to report for duty at the barn, of the change; and (3) even though it was not negligence to make such changes without such notice to the men, including the appellant, was it not negligence

ion the part of the motorman of the car which struck the appellant, knowing as he did that such changes had been so recently made, and that his car was running on the wrong track and out of schedule time, not to use more care and caution than he displayed on this occasion, when he ran his car through the darkness at a speed of from 6 to 12 miles an hour and without giving warning, by bell or otherwise, although he must have known that some of the men were on the track on their way to report for duty at the barn?

Notice could readily and easily have been posted in the car barn of these changes in the method of running the cars, and of the schedule, and it is submitted that it was the legal duty of the appellee to have done so, or to have adopted some other method of acquainting the men with the changes. Omission to do so caused a very serious injury to the appellant, as might reasonably have been anticipated, and the appellant's case is in part grounded on this omission. It would seem difficult to distinguish the present case in principle from that of *Atchison* v. *Wills,* 21 App. D. C. 548. There an employee of the defendant, a plumber, engaged in work in a dwelling-house, left open a trap in the floor of a porch, just outside of the plaintiff's bed-room, without notifying the plaintiff that he had done so, and the plaintiff fell through the trap and was injured. There was a verdict and judgment for the plaintiff, and the case came to this court on appeal on questions of practice and evidence; and no one in the trial court or in this court seems to have questioned the legal liability of the defendant under the circumstances. As in that case the defendant's employee omitted to notify the plaintiff that the use of the porch had been made perilous by his opening of the trap, so in the present case the appellee, by its servants, omitted to notify the appellant that his necessary use of the railroad tracks on this dark December morning had been made even more perilous than it was before by the change in the custom of running the cars on the right-hand tracks and by the change in the schedule time of the first car leaving Georgetown.

It is conceded by the appellant that it was and is the legal right of a railroad company, in the absence of a statute, to use

either its right or left hand track; that there is no law of the road in this respect; and that ordinarily it is not negligence on the part of a company to run a car along the left-hand track. The company owns the right of way and tracks, and is at liberty to run its cars on its tracks in any manner it chooses. But it is submitted that when it has been the custom to run its cars on the right-hand track and it changes that custom, or when the schedule time of running trains is changed, it is its duty to notify persons whose duties require them to be on the tracks of the change.

2. Assuming that the evidence tended to show negligence on the part of the appellee, did it affirmatively show contributory negligence on the part of the appellant? While, of course, if the plaintiff's own evidence shows that he has been guilty of negligence contributing to the accident, he cannot recover, still the burden of showing such negligence on his part is on the defendant. The appellee here has an added burden, for he must concede the truth of the appellant's evidence and all reasonable inferences to be drawn from it and then show that no reasonable man could draw any other inference from it than that the appellant was guilty of contributory negligence.

What is there in the evidence to show that the appellant failed to exercise that degree of care which a reasonable man would have exercised under the circumstances? It is true that, although he was rightfully on the appellee's tracks, such a position was one of danger and required the exercise by him of care and caution to avoid injury from passing trains. But it is equally true that but for the change in the method of running the cars and of the schedule, of neither of which he had knowledge and neither of which he had any reason to anticipate, he would not have been injured. He was injured by reason of none of the ordinary dangers of his dangerous position, but by reason of a superadded danger which he had no reason to anticipate. It was this added danger which, it is contended, he should have been notified of.

As he stepped upon the left-hand track on the morning of his injury, he was, for all that he knew, not in a position of danger, so far as any westward-bound car of the appellee was concerned.

He had left Georgetown at 5.38 or 5.39 A. M. and was due at the
barn at 5.45. He thought, and he had good reason for so think-
ing, that the 5.30 A. M. car had long since left Georgetown, for
it was scheduled to leave at that time, and, as he says in his testi-
mony, he had no reason for thinking that the car would be late
leaving on its first trip in the morning; and no other car was due
to leave Georgetown until 6 o'clock. He selected the only safe
passageway to the barn that was before him, as he thought,
namely, the south or left-hand track. He could not get off the
tracks entirely, for he was in a deep railroad cut; he could not,
with safety, walk in the space between the tracks, because it was
filled with surveyor's stubs and old cross-ties and other obstruc-
tions; and, besides, if he had done so he would have been in
danger from passing cars; he very naturally did not take the
right-hand track, for if any westward-bound car should have
happened along, even though none was due, it would then have
approached him from the rear; so he did what any reasonable
man would have done under the circumstances, and what in fact,
as he testified, the other men usually did do—that is, selected the
left-hand track, the surface of which was comparatively smooth,
and from which he could readily see any approaching car, and
continued his walk along that track. In short, instead of select-
ing the way of greatest danger, he selected the way of least dan-
ger, so far as he could tell. Immediately, he was struck by a
car from the rear, running through the darkness at the rate of
from 6 to 12 miles an hour and sounding no bell or other warn-
ing, and was carried 75 feet along the track, under the car,
before it could be stopped. (From the fact that the car ran 90
feet from the time the motorman saw the appellant, although he
immediately put on the brake, the jury could readily have found
that it was running at the maximum speed fixed by the wit-
nesses.)

The trial court seems to have based its conclusion that the ap-
pellant was guilty of contributory negligence upon the assump-
tion that if he had been listening he necessarily would have
heard the approaching car, and that as he was in a place of dan-
ger he should have been listening. There was no testimony as to

whether he was listening or not. He simply said he did not hear the car. But it is true that it has been decided that such an inference is allowable, namely, that it may properly be inferred that a person failed to look or listen, if the circumstances and surroundings are such that if he had done so he would necessarily have seen or heard an approaching train. But here the circumstances and surroundings are such that such an inference would not be fair. In the first place, as negativing such an inference, we have the testimony of the motorman himself that it was a frosty morning and that on such mornings a car does not make much noise, as the frost seems to deaden the sound. As slight as this testimony is to rebut the presumption that if the appellant had been listening he would have heard the approach of the car in time to get off the track, it was sufficient to submit to the jury for that purpose. But much more important was the fact, seemingly entirely overlooked by the trial court, that the point where the appellant was injured, which was about 60 feet west of the trestle, was only about 240 feet from the car barn, and the time was between the hours of five and six o'clock in the morning, when the cars of five railroad companies were being shifted about preparatory to being sent out on their various routes throughout the city or actually being so sent out. The appellant testified that "Beginning at five o'clock, there were six or eight cars that went out of the barn early in the morning and went eastward to go over the various routes."

The motorman testified that on the morning the appellant was injured, when he left the barn, at about 5.30 A. M., a large number of cars were stored on the north or west-bound track nearly down to the trestle. He further testified that after his return to duty on December 15, which was three days before the accident, cars similarly stored were sometimes removed from the track before 6.30 A. M., when he reached the barn on his return trip from Cabin John. He further testified: "Sometimes on his return the track was clear and sometimes it was not. He did not know how much earlier than 6.30 they might have been removed. When they were removed they went out on their runs.

There were ten or a dozen cars stored on the track. Some belonged to one road and some to another. Some of them were the first cars that were taken out in the morning. About five companies used the shed for the storing of cars. The shed itself would hold about thirty-five cars. There were tracks around the shed for the purpose of storing cars upon."

While there is no affirmative evidence to show that at the time the appellant was injured the cars which the motorman testified were on the north track when he left the barn were still there, it it is fair to presume (especially as the appellant was entitled to the benefit of all reasonable inferences from the testimony, on the motion to direct a verdict) that after the motorman left the barn the work of removing them from that track was begun, and was being done, not only in order to clear the track of cars, so that the track could be used by west-bound cars, but also in order that the cars stored on the track might go out on their respective runs. The work of so moving and shifting these cars alone, to say nothing of the other cars, and being performed as it must have been, within a very short distance of where the accident happened, and being necessarily accompanied by a noise of the same sort as that made by the moving car which struck the appellant, would afford a sufficient reason for the appellant not hearing the approach of the latter car. Certainly, it is as fair to infer that this was the reason, or one of the reasons, that the appellant failed to hear the approaching car as it is to infer, in the absence of testimony to that effect, that he was not listening at all or he would have heard the car, especially when this testimony is considered in connection with and reinforced by that showing that the frost tended to deaden the sound of the approaching car. A little calculation will show that if the car was going at the rate of twelve miles an hour, it took it only twelve seconds to cross the trestle; and beyond the trestle was the curve, beyond which the car could not be seen.

3. In *Howland* v. *Union Street Rwy. Co.* 150 Mass. 86, a boy walking along a railroad track beside an ice cart was struck and injured by a car from the rear, which was five or ten minutes late, the next car not being then due. The court, in deciding

that the case was one for the jury, said: "The boy was in the street for a legitimate and proper purpose. The evidence would have warranted the jury in finding that he had walked upon the street railway track for not more than 80 or 90 feet, by the side of a noisy ice cart, which might prevent him from hearing a street car approaching from behind; * * * that the driver of the street car was careless; that the boy might properly rely on the driver's using greater care than he did use; and that there was no reason to expect a car along at that particular time, the car being five or ten minutes late, and another not yet due. With evidence tending to show this state of things, it was for the jury to say whether on the whole the boy exercised such care as he was bound to exercise." See also *McGhee* v. *White,* 66 Fed. Rep. 503.

The plaintiff was a track-repairer on the defendant railroad, and while thus employed he was run over and had his leg broken by a train running out of schedule time, which suddenly surprised and overtook him before he could get himself and working tools and dumpage car out of the way. *Held* that he was entitled to recover. *Haynes* v. *R. R. Co.* 3 Coldw. (Tenn.) 222.

In *Shoner* v. *Penn. R. R.* 130 Ind. 167, the court held that the conduct of the plaintiff, who was a track-repairer working on the road, was to be measured by a different standard from that of a traveler. The court said: "He was on the road rightfully, and in discharge of duty, and while he was not absolved from the necessity of being vigilant, and careful to avoid danger, he had a right to rely, also, to some extent, on the care and vigilance of others using the same road. Those who are engaged in the active work of operating a railroad, or anything else involving danger to the operatives, are not only required to be watchful and vigilant to conserve their own safety, but owe a similar duty to all others whose duties expose them to the same dangers; and they have, at the same time, a right to rely, to some extent, on the care of each other, and to assume that each one thus employed will use reasonable care to avoid injuring the others. *Penn. Co.* v. *O'Shaughnessy,* 122 Ind. 588."

The starting or running of a switch-engine in a switch-yard

filled with a network of tracks upon which cars are constantly moving and upon which yardmen are constantly at work without the ringing of a bell or blowing of a whistle is negligence irrespective of any statute on the subject. *Railroad* v. *Elliot*, 74 N. Y. 627. See also *McGraw* v. *Railroad Co.* 50 La. Ann. 466, 23 So. 461.

Where an engineer received no notice of the running of another train and collided with it, it was *held* that he had a right to assume the road was clear, and the company was liable for his injuries. *McChesney* v. *Panama R. R. Co.* 74 Hun. 150. See also *Tubbs* v. *R. R. Co.* 107 Mich. 108; *Klotz* v. *R. R. Co.* 68 Minn. 341.

"When one expressly or by implication invites others to come upon his premises, whether for business or any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit." Cooley on Torts, 604–607, cited with approval and applied in *Bennett* v. *R. R. Co.* 102 U. S. 577. See also *Penna. R. R. Co.* v. *Hammill* (N. J.) 24 L. R. A. 531; *Kay* v. *R. R.* 65 Penna. St. 269; *R. R.* v. *Bodemer*, 139 Ill. 115; *Sweeney* v. *R. R.* 10 Allen, 368.

Where a railroad company builds houses for its workmen, so that there is no access to or from them except over its tracks, a workman who is boarding with an occupant of one of the houses may recover for an injury received while crossing the track caused by the negligent operation of a train. *McDermott* v. *R. R. Co.* 28 Hun, 325; affirmed in 97 N. Y. 654. See also *Clampit* v. *Rwy. Co.* 84 Iowa, 71; *Taylor* v. *D. H. Canal Co.* 113 Pa. St. 162; *Seymour* v. *R. R. Co.* 69 Vt. 555.

An employee of a railroad who is engaged in delivering a car to another railroad upon the latter's tracks in the regular course of business between the two companies is not a mere licensee, and the rules of law applicable to mere licensees do not apply to him. *Turner* v. *B. & M. R. R.* 158 Mass. 261. See also *Rwy. Co.* v. *Bodemer*, 139 Ill. 596.

*Mr. Charles C. Cole, Mr. J. J. Darlington,* and *Mr. R. B. Behrend* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

1. With respect to the alleged negligence on the part of the defendant company, a careful examination of the evidence contained in the bill of exception has brought us to the conclusion that the court below committed no error in directing a verdict for the defendant. There is no sort of ground shown for contending that there was negligence on the part of the motorman or conductor in running the car at the time and place where the accident occurred. They were acting strictly within the line of their duty, and did nothing of which the plaintiff could justly complain. Indeed, we do not understand that there is any attempt to impute negligence to them. And it is conceded that the defendant company had full control and right to run their cars over their railroad at such time, and over such of their tracks, as they might deem it necessary for the execution of their work; and that it was no violation of duty to anyone to run their cars upon one track rather than another, when the exigency or convenience of the service undertaken by them rendered it proper, in their judgment, so to do. In operating a double track railroad the owner is bound by no rule that requires that he shall use the right-hand track for the running of cars in one direction, and the left-hand track for the running of cars in the reverse direction. He may run his cars on both tracks in either direction, as the needs of the business may require. But it is contended that if there be change made in the operation of a railroad, either as to the time of running, or the change of direction of trains on several tracks, there should be notice given of such change to employees and others concerned, so that they may pursue their course accordingly. This would certainly be an unusual requirement, and one that might be very embarrassing in the operation of a railroad on important occasions. All parties coming in contact with the operation of a railroad must be presumed to know that the owner has entire control and direc-

tion of the course and manner of operation, and so long as there be no contractual obligation or public duties violated, the owner must be allowed to exercise his own judgment and discretion in the use of his property. Where the accident occurred the car was not at any stopping place, nor at any crossing of either a public or private way, where signals were required; it was passing where it was entitled to an unobstructed right of way.

The only principle upon which the plaintiff could possibly claim to recover in this action is that where an owner of land induces another, by usage or otherwise, to enter upon or pass over his premises, such owner will be taken to assume the liability that the premises are safe and fit for the purpose for which they are allowed to be used. In this case it may be assumed that the plaintiff, as he was required to report at the barn by a certain hour in the morning to commence his daily work, and there was no other convenient way for him to reach the barn, was in the exercise of a conceded privilege, distinguishing him from a trespasser, in passing over the right of way of the defendant in order to get to the barn. Such circumstances would seem to be within the principle of the case of *Bennett* v. *Louisville & N. R. Co.* 102 U. S. 577, 26 L. ed. 235, and the cases there cited. But this privilege of passage over the right of way of the defendant company, beyond the limits of the city, did not justify the plaintiff in using the railroad tracks as a foot way, and especially not in front of a moving car, which, to a person using ordinary care, could and ought to have been seen at a distance of 350 feet before it reached him. Railroad tracks are never intended as foot ways, or to be used as such; and every person is required to take notice that they are dangerous. In this case, the plaintiff by his own testimony, and that of his witness, the motorman of the car, has shown that the space between the tracks was ample along which he could have walked in safety, and without coming in collision with the passing car.

We discover no error in the ruling of the court below, and we must therefore affirm the judgment.        *Judgment affirmed.*