## Union Stock Yards Transit Company v. Michael E. Franey.

### Gen. No. 13,392.

1. LICENSEE—*who is not mere.* A person upon premises for the purpose of tending his live stock, temporarily stored thereon, is not a mere licensee where such premises have been specially provided by a company organized for its own profit as a place for temporary storage of live stock and as a place further where buyers and sellers of such live stock may meet and transact their business, but such a person is deemed to be upon the premises in question at the invitation of the owner thereof.

2. CONTRIBUTORY NEGLIGENCE—*what not, as a matter of law.* It is not contributory negligence for the owner of live stock temporarily stored at a place provided for such purpose, to enter upon such premises in the dark for the purpose of feeding his stock.

SMITH, J., dissenting.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. JOHN L. HEALY, Judge, presiding.

Heard in the Branch Appellate Court at the October term, 1906.
Affirmed.   Original opinion filed November 8, 1907.   Rehearing de-
nied and opinion modified and refiled December 13, 1907.

**Statement by the Court.** This is an action in which appellee recovered a judgment for personal injuries, from which this appeal is taken.

Appellee, a farmer at or near Healy in this state, shipped a carload of hogs consigned to the National Live Stock Commission Company at the Union Stock Yards, Chicago. This was November 12, 1901. The hogs reached Chicago the morning of November 13th, and were unloaded at or about six o'clock A. M. into a chute or pen, and there, it is said, delivered by appellant to the consignee. Employes of the consignee, it is claimed, drove the hogs up an incline or covered passageway to the second floor of the hog house belonging to appellant and thence about two or three hundred feet along a passageway between tiers of pens on the second floor to pen 56, in which they were placed.

Appellee followed after the hogs from the chute to the pen. One of the men who had driven the hogs up was apparently still there, but was about to leave and did so. Appellee was left alone and concluded, it is said, to give his hogs a drink of water. He states that he does not remember how he got into the pen, and it does not appear whether he went in with the hogs or climbed in afterward. He made his way through the hogs to the watering trough, but was unable to reach the faucet which had been turned away from the watering trough of that pen, apparently to put water into the trough of another pen, and as the hogs were pressing around him, it is said, he climbed over the fence and out of the pen and standing on the outside of the pen turned on the water. He says that he was facing the pen and standing on what he supposed was a floor. He remembers seeing the water flow and the hogs drinking. That is the last he remembers until he "woke up at the hospital." He had fallen into a

light and air shaft and was found shortly after, lying unconscious on the floor fourteen feet below.   This air and light shaft was an opening of about three or five feet by sixteen feet, which had been made after the erection of the building, the space being taken off pen 57 as originally constructed.   The shaft was surrounded on all sides by fences enclosing the pens and about four feet high.   There was a platform or ledge, being a portion of the former floor space left on two sides of the opening, which was not fenced off from the shaft.   This floor was three feet wide on one side and from one to two feet wide next to pen 56 in which were appellee's hogs.   There is evidence tending to show that after the hogs were placed in the pens the gates were locked by appellant's employes, who alone had the keys.   The building, pens, feed and facilities were furnished and owned by appellant and the latter charged for inspection, yardage, feed and the like.

It was not unusual for owners of stock to come with it to the yards, where in many cases they looked after the feeding and watering, going about among the pens, comparing their own stock with that of other shippers and climbing over the fences into the various pens for such purposes.   Climbing over was apparently the only way they could get into the pens, since the gates were kept locked by appellant.   The latter did not buy or sell stock, but furnished facilities for those who did, for which it charged.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; JOHN BARTON PAYNE and JOHN D. BLACK, of counsel.

SAMUEL SHOPE PAGE, for appellee; CECIL PAGE, of counsel.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is contended in behalf of appellant that appellee was not rightfully at the place where he was injured,

that he had no business there and was at most a mere naked licensee; that the place was sufficiently lighted for the purpose for which it was used, and that appellant was not bound to anticipate that anyone would go there in the dark of an autumn morning, climb over fences and fall down a light shaft; that the light shaft was enclosed by a double board fence four feet high, the same kind of fence which enclosed the 2799 other pens in the hog house, that it was sufficiently guarded, that no other enclosure could have been provided unless the shaft had been closed, and that appellee was guilty of gross negligence which was the proximate cause of his injury.

As to the first of these contentions that appellee was a mere naked licensee to whom appellant owed no duty to keep the premises safe for his use, the general doctrine is stated in Bentley v. Loverock, 102 Ill. App. 166-168, quoting from Buzwell on Personal Injuries to be that ''a mere naked license or permission to enter upon the premises will not create in favor of the person entering or impose upon the owner or tenant who grants the license an obligation to provide against dangers or accidents which may arise out of the existing condition of the premises, for the licensee goes upon the premises subject to all dangers attending his going and so enjoys the license subject to its concomitant perils. (Citing cases.) Thus the owner is not liable for injuries received by a licensee falling into an excavation left unfenced upon the land (Reardon v. Thompson, 149 Mass. 267) or by the existence of obstructions, such as logs lying in the path. Nor is the owner of a building bound to fence or enclose dangerous machinery contained in it for the protection of a licensee.'' In the case of Gibson v. Leonard, 143 Ill. 182-189, cited by appellant as the leading Illinois case upon the subject, it is said that ''the fundamental inquiry in this case is whether or not appellee owed a duty to appellant to so construct, keep and maintain the elevator or hoisting apparatus as that

it should be a safe means for his transportation from one story of the building to another.  Actionable negligence or negligence which constitutes a good cause of action grows out of a want of ordinary care and skill in respect to a person to whom the defendant is under an obligation or duty to use ordinary care and skill.  The owner of land and of buildings assumes no duty to one who is on his premises by permission only and as a mere licensee, except that he will refrain from wilful or affirmative acts which are injurious.'' The case is different, however, where a party is on the premises of another on lawful business in which both parties have an interest.  Bennett v. R. R. Co., 102 U. S. 577-580.  In such case an invitation may be implied and the licensee is not to be deemed as having gone there upon a bare permission.  In such case when using due care for his own safety he has a right to assume that the owner has himself taken due care to maintain the premises in a reasonably safe condition for his use in the prosecution of their mutual business interests and relations.  In Thompson on Negligence, p. 309, citing Carleton v. Franconia I. Co., 99 Mass. 216, it is said:  ''The rule which obtains here has been thus expressed by Gray, J., with his usual clearness and accuracy:  'The owner or occupant of land is liable in damages to those coming to it, using due care at his invitation or inducement, express or implied, on any business to be transacted or permitted by him, for an injury occasioned by the unsafe condition of the land or of the access to it which is known to him and not to them and which he has negligently suffered to exist and has given them no notice of.' '' Tutt v. Ill. C. Ry. Co., 104 Fed Rep. 741; Bennett v. R. R. Co., 102 U. S. 577-580.  See also Elgin, Joliet & Eastern Ry. Co. v. Thomas, 215 Ill. 158.  In that case it was said by the Appellate Court when the case was before it (115 Ill. App. 508-512) that ''the appellant by accepting and hauling the cattle has furnished strong presumptive evidence that there was some per-

mission given and consent to the delivery of the same to it by its connecting lines. The owner of the cattle had implied consent of appellant to cross over the yards and look after his property."

Applying these principles in the present case it is not disputed that appellant provided the premises in question for its own profit to be used as a place of temporary storage of live stock shipped to Chicago for sale "and where buyers and sellers may meet, either in person or by their agents, and transact the business of buying and selling such live stock." Am. L. S. Com. Co. v. The Live Stock Exchange, 143 Ill. 236. The hogs of appellee were placed in a pen for the use of which appellant charged him, and were securely locked in the pen, the keys being in possession of appellant's employes. It was not the first time appellee had brought stock to appellant's premises. He had been doing the same thing for quite a number of years. He was doing on this occasion when he followed the hogs to the pen what, according to the evidence, he had been in the habit of doing on prior occasions and what there is evidence tending to show other shippers were in the habit of doing. He met there on the morning in question another shipper who had hogs stored in an adjacent pen. There is evidence tending to show that appellant was in the habit of selling and furnishing to owners of stock, corn, hay, oats, etc., which it was necessary for the owner or his agent to feed to the stock. It furnished also facilities for watering the stock in the pens, and there is evidence to the effect that it did not itself ordinarily attend to either feeding or watering. Appellee in this case was injured, according to the evidence, while supplying his hogs with water by means of troughs and hydrants which appellant had furnished for the purpose. It is evident that if appellant furnished these facilities for the owner's use in caring for his hogs it must be deemed to have extended by clear implication an invitation to appellee to use them. In Bennett v. R. R.

Co., *supra*, Mr. Justice Harlan quotes with approval as follows: "One who comes upon another's land by the owner's permission or invitation has a right to expect that the owner will not dig a pit thereon so that persons lawfully coming there may receive injury."

It is claimed, however, that these facilities were not furnished for the owner's use, but for the use of employes expressly authorized to use them in caring for stock. There is considerable testimony as to the long-continued practice of shippers and owners of stock delivered at appellant's yards and put in appellant's pens, frequently to attend to their own stock and to visit pens where stock of other shippers was confined to inspect and compare character and quality of stock. It is claimed in appellant's behalf that the admission of this evidence was reversible error. In appellant's original brief the point was dismissed with a statement that it was not deemed necessary to cite authorities as the error was believed to be manifest. In an additional brief since filed, the question is argued at length. That the hogs were consigned to the commission company and were "handled and sold by" them is not apparently disputed. There were charges made by appellant covering, as a witness testifies, "freight as a general thing, yardage eight cents a head on hogs, feed charges at fifteen cents a head, for carload inspection and commission $6 a car." The feed was ordinarily purchased by the commission company, the consignee, from appellant, and by the commission company charged against the owner of the hogs upon settlement of accounts. There is evidence to the effect that "as a general rule" the animals are fed and watered by employes of the commission company to which they were consigned. It is urged in appellant's behalf that charges were not made by appellant to the shipper but only to the commission company, the consignee, and that "the facilities were not furnished for the use of the owner but for the use of the consignee." It was

nevertheless the owner who paid for these facilities so furnished to his agent, the consignee; and an employe of the commission company testified that he had seen a great many cattle and hogs unloaded and yarded and fed, "and I have seen a great many representatives, owners and shippers who are with them to shake up their hay and go in the pen and sprinkle the corn around so that the hogs would have better access to it." The witness states that appellant placed no limitation that he knew of upon owners and shippers who accompanied their stock in doing those things, that he had seen appellee when "coming to the yard with stock" do things of that kind. There is considerable other testimony to the same effect, and also evidence tending to show that owners could and did order and obtain feed directly from appellant which they were permitted to and did themselves feed to their stock. In our judgment this testimony tends to show more than a mere custom on the part of appellee and other shippers to go into their pens to look after, feed and water their stock. It furnishes evidence upon which the jury might properly find that appellant permitted and encouraged them in the practice, extending by implication an invitation to them to do so, an invitation accepted not only by shippers generally but, as there is evidence tending to show, by appellee himself prior to the accident in controversy. We are unable to see why this evidence was not competent for such purpose. The case differs materially from those cited by appellant's counsel, of which Hickey v. B. & L. Railroad Co., 96 Mass. 429, is an illustration. In that case the plaintiff offered to show that it had been a practice of passengers in a smoking car to leave it by permission of a conductor only, just before it was uncoupled, and go upon the platform of a passenger car in front and to ride thereon into the station. The court said if they voluntarily took exposed positions with no action thereon nor inducement thereto caused by the managers of the road except a bare license by

non-interference or express permission of the conductor, they take the special risks of that position upon themselves.'' In the case at bar, however, the evidence tends to show, as we have said, an express invitation to appellee and other owners which was constantly acted upon without objection by appellant, to frequent the neighborhood of the pens containing their own and the stock of other owners. Elgin, J. & E. Ry. Co. v. Thomas, *supra*; Connell v. Southern Railway Co., 91 Fed. Rep. 466. In the case last cited it is said: ''Beside the proof in reference to his dealings that evening with the employes in the yard office, there was other testimony tending to show that it was not unusual for shippers of stock to visit the yard office to expedite the transfer of their cars from the Georgia Railroad to connecting lines. The proof tended to show that such was the custom in the yard office of the defendant railway company.''

It is urged that appellee was guilty of contributory negligence which was the proximate cause of his injury. Whether it was negligent to leave a place open in the floor with no protection except the ordinary fence, four feet high, which surrounded all the pens, over which fences, as there is evidence tending to show, stockmen were in the habit of climbing to water and feed their stock at all hours when their stock came in, with nothing to indicate the presence of the opening in what had formerly been a pen like the others, was a question of fact for the jury upon which their finding is adverse to appellant. Under the circumstances we do not regard the evidence which it is insisted shows appellee to have been guilty of contributory negligence as warranting interference with the verdict. Appellee testifies that he found it difficult from within the pen to turn the spout so as to cause the water to flow into the trough in the pen containing his hogs, and so was led to climb over the fence. Here he stood a while after, as he states, starting the water to flowing into the trough, upon the unprotected edge of the open-

ing, which in the darkness, he had not seen and of the existence of which he was unconscious. It appears that the opening in question occupied space which had been taken from what was formerly pen 57, adjoining pen 56 in which were appellee's hogs, a circumstance which it is apparent might in the darkness have misled him to suppose that he was standing in safety upon the floor of pen 57, while he stood there watering his hogs. The case differs materially, we think, from those where an injured person has stepped negligently into an elevator shaft after opening an elevator door, some of which cases are cited in appellant's brief. "What kind of protection could be used" asks appellant's counsel, "against a man who, in the night time and in a place where he had confessedly never been before, would climb over a fence in the dark?" It suffices to say that, as evidence apparently undisputed tends to show, the fence over which appellee climbed was one of the fences bounding the pens, and that after climbing over it, he stood in the dark upon a part of the original floor of pen 57 left as a kind of ledge beside an unlighted air shaft, without any distinguishing fence or guard of any kind to give notice of its existence or prevent appellee from falling into it as he did. The question of contributory negligence was, so far as appears, properly submitted to the jury, and we discover no reason which could justify us in disturbing their finding.

No complaint is made as to the amount of the finding and judgment. No material error appearing in the record the judgment of the Circuit Court must be affirmed.

*Affirmed.*

Mr. Justice SMITH dissenting.