**BROUSSARD**

**v.**

**BURTON CONST. & SHIPBUILDING CO., Inc. et al.**

**No. 3118.**

Court of Civil Appeals of Texas.

Waco.

Feb. 18, 1954.

Rehearing Denied March 11, 1954.

Orgain, Bell & Tucker, D. F. Sanders and Alto V. Watson, Beaumont, for appellant.

Marcus & Weller and Cecil, Keith & Mehaffey, Beaumont, for appellees.

TIREY, Justice.

Appellant, plaintiff below, grounded his suit against Burton Construction & Shipbuilding Company, Inc., hereinafter referred to as "Burton" on negligence, claiming that he received his injuries on the premises of the company while he was an invitee, or, in the alternative, a licensee, his injuries resulting from an explosion which occurred while he was on the premises, which resulted in the loss of vision in both eyes, and other injuries. Appellant denied that he was an employee of Burton at the time he was injured and that he was not injured in the course of his employment, but he alleged in the alternative a cause of action against the Texas Employers Insurance Association, hereinafter referred to as the "Carrier" under the Workmen's Compensation Law, Vernon's Ann.Civ.St. art. 8306 et seq., to recover against the Carrier on the basis of total permanent disability, alleging specifically that his cause of action against the Carrier was subject to the contention that he was not an employee of Burton but on the contrary he was an invitee.

Plaintiff went to trial on his original petition and alleged that the explosion was caused by the negligence of defendant, its agents, servants and employees, and that he relied on the doctrine of res ipsa loquitur. In the alternative and without waiving his allegations of general negligence and relying on the doctrine of res ipsa loquitur, he pleaded eight specific acts of negligence. They are substantially: (a) in using highly inflammable paint; (b) that the paint used contained an undue amount of naphtha; (c) in using a defective light cord inside the barge while it

was being painted; (d) in failing to inspect the light cord; (e) in failing to take the proper precautions to prevent said explosion; (f) in failing to take proper precautions to prevent sparks of fire while the barge was being painted; (g) in failing to provide fans to draw off the explosive fumes that were created in the course of painting; and (h) in painting inside a closed barge without taking proper precautions to prevent an explosion.

The Carrier answered to the effect that plaintiff was not an employee at the time he received his injuries and asserted other defenses not pertinent here. Defendant Burton entered a general denial and specially pleaded that appellant was a trespasser, or, in the alternative, a licensee, and an alternative plea that he was an employee of Burton, and that appellant's sole remedy was under the Compensation Law, and a further plea of contributory negligence.

At the conclusion of the evidence the court overruled Burton's motion for peremptory instruction but granted the motion of the Carrier.

The jury in its verdict found that (1, 2 and 3) appellant sustained an injury while on the premises of Burton by reason of an explosion on a barge on the premises, such barge being in the exclusive control of Burton, and (4) while the employees of such company were engaged in painting the interior of the barge at the time of such explosion, and (5) that such painting was under the exclusive control of Burton, and (6) that appellant was an invitee on the premises at the time; (7) that appellant was also a licensee at such time, and further (8) that he was not a trespasser, and (9) that such painting was being done in a negligent manner; and (10) that such negligence was a proximate cause of the explosion; (11) that the paint which was being used was highly inflammable; (12) that it was negligence under the circumstances to use such highly inflammable paint, and (13) that this was a proximate cause of the explosion; (14) that explosive fumes were created in the course of painting the barge, and (15) that it was negligence under the circumstances to paint in the barge while explosive fumes were created with no ventilating fans in operation, and (16) that such negligence was a proximate cause of the explosion; (17) that Burton was using a light in said barge which was not properly equipped to prevent sparks, and (18) it was negligence under such circumstances to use such light, and (20) at the time of the explosion appellant was an employee of Burton; (21) that appellant was not in the course of his employment with Burton at the time he received his injuries; (22) that he was not negligent in going near the barge at the time; (24) that appellant did not fail to use ordinary care in placing himself in close proximity to the barge being painted while painting operations were being conducted; (26) that appellant did not voluntarily place himself in close proximity to the barge being painted while painting operations were being conducted; (29) that appellant was not smoking a cigarette in close proximity to the barge at the time of the explosion; (32) that J. A. Tibbetts did not know that appellant was on Burton's premises just prior to the explosion; (33) that appellant did not know that Tibbetts was in charge of Burton's premises at the time of appellant's conversation with Henry Fruge; (34) that appellant did not go beyond the carpenter shop solely for the purpose of talking to the painter Mott about personal matters; (35) that Henry Fruge was off duty at the time of his conversation with appellant just prior to the explosion, and (36) that appellant knew that Fruge was off duty at the time of his conversation with him. The jury further found (37) that the explosion was not the result of an unavoidable accident, and (38) fixed his damages at $50,500.

The court overruled appellant's motion for judgment on the verdict. Burton seasonably filed his motion for judgment non obstante veredicto and pertinent to this discussion he asked the court to set aside the jury's findings to Issues Nos. 6, 7, 8, 9, 12, 13, 15, 17, 21, 33 and 34. In the alternative Burton alleged in said motion

that if plaintiff was not a trespasser at the time and place of the explosion, that under the undisputed evidence plaintiff occupied the legal status of an employee as a matter of law, and as such, he was covered under the terms of the Workmen's Compensation Law of Texas at the time and place of his injury, and that defendant's policy of Workmen's Compensation Insurance is a complete bar to the plaintiff's cause of action against him.

We quote in part from the decree: It appearing to the court that the defendant Burton "duly filed in this court a proper motion for judgment non obstante veredicto on the grounds that the evidence raised no issue of fact, and that a directed verdict for said defendant * * * would have been proper, and in which motion said defendant also requested the court to disregard the jury's findings on certain special issues, including the jury's said finding in response to Special Issue 6 above shown; * * * and being of the opinion that the jury's finding and answer to said Special Issue No. 6 had no support in the evidence and should be disregarded, and * * * that a directed verdict for said defendant * * * would have been proper, and that the motion of said defendant for judgment non obstante veredicto herein should be granted, it is accordingly ordered that said motion be, and it is hereby granted, and that judgment non obstante veredicto be entered for said defendant Burton * * *. * * * it is further ordered that said respective motions of the parties for judgment on the verdict are, each and both, overruled."

In the decree we find this further recital: "And said jury at the same time, under instructions from the court, having returned their verdict against the plaintiff, Oralee Broussard, and in favor of the defendant, Texas Employers Insurance Association, said verdict was in all things duly received and accepted by the court, and was ordered filed, and was actually filed and entered upon the Minutes of this court." The decree provided that appellant take nothing against the Insurance Carrier.

The judgment is assailed substantially on three points: (1) that the court erred in setting aside the jury's finding to Issue 6 and in granting Burton's motion for judgment non obstante veredicto; (2) in overruling appellant's motion for judgment on the verdict; and (3) subject to the foregoing points of error, in granting the Carrier's motion for instructed verdict.

The first question that must claim our attention is: Did the trial court err in setting aside the answer of the jury to Issue 6 to the effect that the plaintiff was an invitee on the premises at the time and place of his injuries? Our view is that he did.

Since the jury found that plaintiff was an invitee, we are concerned only with the evidence favorable to this finding. Before reviewing the testimony tendered in this behalf, perhaps we should say that Broussard pleaded in effect that on the day he was injured he had returned to the premises of Burton, where he had been formerly employed, to discuss a raise in pay and resume his employment if his request for raise was granted; that if his request for raise was not granted and he was not rehired he intended to collect his back pay which was due and pick up his clothes and work tools which were on Burton's premises; that while on the premises as an invitee he was injured as the result of the negligence of Burton and its employees. Burton's answer consisted of general denial, a plea that plaintiff was a trespasser, or, in the alternative, a licensee, or, in the alternative, an employee, and the further plea of contributory negligence.

Before detailing the evidence which we think is pertinent to the issue of invitee and licensee, we quote the instruction given by the court:

"By the term 'invitee' as used in this charge is meant a person on the premises of another at the time and place in question, by express or implied invitation. By express invitation is meant an invitation extended by the owner or those in charge of the premises. By implied invitation is

meant a person on the premises at the time and place of the occurrence in question with knowledge and consent of the owner or those in authority for a purpose connected with the business in which the owner is engaged, and there must be at least some mutuality of interest in the subject to which the visitor's business relates.

"You are further instructed that a person may be an invitee as to certain parts of the premises of another, but not an invitee as to other parts thereof, and that in order to constitute a person an invitee as to any particular part of such premises, there must be an invitation, either express or implied, extended by the owner or someone having actual or apparent authority to do so, to such person to come upon or be upon such part of such premises.

"By the term 'licensee' is meant a person who goes on the premises of another by express or implied permission of the owner or those in charge of the premises.

"You are further instructed that a person may be a licensee as to certain parts of the premises of another, but not a licensee as to other parts thereof, and that in order to constitute a person a licensee as to any particular part of such premises, there must be either express or implied permission granted by the owner or one having actual or apparent authority to grant permission, to such person to be on such part of the premises, with knowledge of the premises of such person on such part of the premises."

■ The only objection to the foregoing instruction carried forward in the brief is Point 16 by appellee Burton. The record shows that Burton did object to the failure of the court to define the term "apparent authority" as used in the foregoing definition, but he did not submit to the court a definition of this term, and for that reason such point is overruled. See Rule 279, Texas Rules of Civil Procedure; Magnolia Petroleum Co. v. Johnson, Tex.Civ.App., 176 S.W.2d 774.

In defendant Burton's brief we find substantially the following statements: Brous-

sard had been an employee of Burton for about four years prior to the injury made the basis of this suit, said company being engaged in the construction and repair of various types of sea-going vessels. It maintained a shipyard adjoining the Neches River ship channel and covering several acres of land, extending from the water's edge back to State Highway No. 87. On the premises were several buildings, including an office building, a carpenter shop, a machine shop, a plate shop, and a warehouse. There was an area adjacent to the water's edge where vessels were constructed before being placed in the water for final work on them. Persons entering the premises from Highway 87 (which was the only entrance) would have to pass first by the front office, and opposite this office was a parking lot provided for employees and visitors. A double railroad track traversed the premises between the front office and parking lot and the rest of the premises and two signs were erected and placed by the railroad tracks, one of which stated "No Visitors Allowed. Apply at Office" and the other reading "No Personal Cars Beyond This Point." These signs were put up by Broussard himself. At the time of Broussard's injury, a barge under construction was located in the water of the ship channel, the interior of which was being spray painted. The distance from the point of entrance to the premises up to the railroad track was 160 feet. Thence from the railroad track to the carpenter shop was 72 feet plus. From the carpenter shop to the water's edge was 123 feet plus, thus making a total of 190 feet from the railroad tracks to the water's edge. While there was some dispute as to whether he was fired or quit, Broussard's employment had been terminated, insofar as active duties were concerned, at noon on July 12, 1951 (a Thursday), but he did not receive his pay on that date, and was told to return to get his pay check. He kept his work clothes and some tools in the carpenter shop on the premises and did not take these with him when he left the premises on Thursday, July 12. He did not return to the premises at any time on Friday, July 13, but at about six o'clock a. m. on

Saturday, July 14, he did return with his nephew who worked for Burton. According to Broussard, he returned for the purpose of discussing with O. W. Burton (President of appellee Burton) the matter of an increase in pay, and of getting his pay for the work previously performed. The reason for his leaving his active employment was that Burton had refused to grant him a pay raise that he had requested on Thursday, July 12. Further, according to Broussard, he intended to go back to work if Burton would grant his request for a pay increase, but otherwise he intended to collect his pay previously earned, and depart with his clothes and tools. He entered the Burton premises at about six o'clock a. m. in an automobile of his nephew, and the auto was then parked on the lot opposite the front office. The front office was not open at the time, so he walked toward the railroad tracks and there met Henry Fruge, a night watchman. He had some conversation with Fruge inquiring as to Mr. Burton's whereabouts and was told by Fruge that Mr. Burton had gone fishing. During this conversation, according to Broussard, a painter named Mott, who was working on the barge in the water, called to him. Also, according to Broussard, Fruge told him to go see what Mott wanted, so he proceeded to walk from the railroad track to the edge of the dock where the barge was tied up and when he reached the barge, before he had any conversation with Mott, an explosion occurred inside the barge, causing his injuries. The explosion occurred shortly after six o'clock a. m. on Saturday, July 14, 1951.

Broussard testified to the effect that it was about 200 feet from the entrance on the premises to the railroad track; that there were two signs posted by the railroad track nearest to the front office and that the meaning of the sign was "No Visitors"; that he put the signs up and knew that visitors were not supposed to go beyond that sign; that it was about 75 feet from the "No Visitors" sign to the carpenter shop, where he kept his clothes, and that in order to get his clothes as well as his tools he didn't have to go any farther

than the carpenter shop; that Burton hadn't made any agreement about more money and that Burton had not 'phoned him on Friday to come out and talk about more money; that Tibbetts was top boss when Mr. Burton and Mr. Hoeny were not there; that all he said to Tibbetts was "good morning"; that it was 75 to 100 feet from the carpenter shop to the edge of the water where the barge was being spray painted; that at the time there was another barge on the land, up on cribbing blocks, and to get close to the barge being painted he had to pass under the barge that was up on the blocks; that he passed Tibbetts standing in the door of the carpenter shop; that Tibbetts did not tell him to leave the yard or ask where he was going.

Burton testified to the effect that his regular pay day was Friday, at 4:30 p. m., at the carpenter shop, though men on the night shift would sometimes get their checks either at the front office, or from the night foreman; that there were two signs by the railroad track, one saying "No Visitors—Apply at Office" and the other saying "No Personal Cars Beyond This Point"; that men who were employed were hired at the front office; that in the area between the railroad tracks and the water, Mr. Hoeny had authority to approve a man, but could not hire him, that the hiring of men was done at the front office; that when Broussard came to his office he threw his card on his desk and said "I quit." That the employees were not paid for the current week until Friday of the following week, so that Broussard had some money coming from the previous week, and that if he had not quit he would have received his pay the next day, Friday, July 13, at 4:30 p. m.; that he told Broussard to get out of the office and that his money would be ready at eight o'clock the next morning; that it would have been ready in the main office; that he did not see Broussard the remainder of Thursday, July 12, nor on Friday, July 13; that he did not contact him, nor did Broussard contact him; that he met Hoeny at the yard at about 3:50 a. m. on the morning of July 14, as they were planning to go

fishing; that he did not see Broussard there at that time; that Fruge, the night watchman, was there, and Mott, a journeyman painter, was preparing to paint the interior to the barge; that Mott had no control over other employees; that when they left, the yard was in charge of the night watchman; that Tibbetts was foreman; that Tibbetts was not there when he and Hoeny left; that when Tibbetts came on the yard he was higher in authority than Fruge or Mott.

Burton further testified:

"Q. I'll ask you to state what the facts are as to whether or not on the 14th of July, 1951, you had any intention of increasing the pay Broussard had been receiving prior to the time he quit? A. I did not.

"Q. Had you so told Broussard? A. I didn't tell him I would raise him. * * *

"Q. Prior to the time you left the shipyard at approximately 4 o'clock in the morning, did you have any notice or knowledge or information in any way that Oralee Broussard was going to come out there that morning? A. No, sir, I had no way of knowing he would come out.

"Q. Had any word been sent to you by anyone that he was expecting to come out there and talk to you? A. No, sir:

"Q. Had he communicated with you in any way between the time Thursday at noon when he left and the time that you were there around 4 o'clock in the morning? A. No, sir."

Mr. Hoeny, the Plant Superintendent, testified to the effect that on the morning of the explosion he came to the yard shortly before 4:00 a. m.; that he had the painter Mott there at the time for the purpose of painting the barge and that the reason for starting the operation that early in the morning was because there was less heat and nobody was on the yard and there wouldn't be any danger; that there would just be the men there doing the job; that he and Mr. Burton left within a few minutes of four o'clock.

Mott testified to the effect that he did not call to Broussard and said he had no reason to call him and that Broussard crawled under the barge up on the cribbing blocks and came within three feet of him and that they had a personal conversation about a tool box he had loaned Broussard and that then the explosion occurred. (End of substantial statements from Burton's brief).

Plaintiff was 34 years of age at the time of the trial; he was born and reared in Louisiana and went through the fifth grade at school; he had worked on a farm in Louisiana and did carpenter work during the war; that he was injured in July, 1951, and at the time he was injured he had been living in Port Arthur approximately four years; that O. W. Burton was President of defendant Burton Company, and that when plaintiff moved to Port Arthur his sister and niece were working for O. W. Burton, and plaintiff's first job was with O. W. Burton. Plaintiff did yard work and other odd jobs for Mr. Burton, and Mr. Burton personally hired him to go to work at the Construction Company as a carpenter's helper; that the first work he did when he got to the shipyard was to clean up Mr. Burton's office; that plaintiff cleaned Burton's fishing boat; that when he cleaned up the offices, which he would do the first thing in the morning, he would be dressed in his street clothes, and he had some work clothes which he kept on the premises that he would then put on to use for his other work; that he also kept some of his working tools on the premises; that since he had been in Port Arthur he had never worked for anyone except Burton and the Construction Company. Appellant's wife testified to the effect that she had been employed in the household of Mr. Burton for some time and that her employment had ended about a month before the explosion; that Mr. Burton had advanced money to her and her husband when they needed it.

Mr. Burton testified in part: "Q. He had done so much work of a personal nature for you that they generally referred to him as your darky. A. Yes, sir."

672

Evidence was tendered to the effect that on July 12, plaintiff asked the carpenter foreman, Tibbetts, for a raise in pay and he referred him to a Mr. Hoeny (Superintendent), who advised him he was getting enough already, and said to him, "If you don't like that, there's the clock." Broussard testified to the effect that he knew Hoeny couldn't fire him because "whenever I was on the job and Mr. O. W. wanted me, he was going to come and get me." Broussard went and got a time card and went to the office to see Mr. Burton. This took place about noon.

On cross-examination by counsel for Burton, appellant testified in part:

"Q. You did a lot of personal things for Mr. O. W., didn't you? A. Yes, sir.

"Q Go with him on fishing trips? A. Yes, sir. * * *

"Q. Mow his yard at his house? A. Yes, sir.

"Q. When you did that, he paid you extra out of his own pocket? A. Yes, sir. * * *

"Q. As a matter of fact, you were the highest paid colored employee out there? A. The highest paid and the best one too."

That when he went in to Mr. Burton's office, Mr. Burton was talking on the telephone and after he finished the conversation,

"Q. Did you lay your card on the desk and tell him you were quitting or what? A. No, sir, I handed it to him. He asked me what was wrong. I told him, 'Mr. O. W. I want more raise because my children need clothes' * * *

"Q. What did he say to you in regard to whether or not he would give you a raise? A. He said, 'Bruce,' he said, 'I'm going to fire you.' And he says, 'Here's your card; give it to Mr. Kennon.' Mr. Kennon took it out of my hand and was going to write it out, and Mr. O. W. told him, 'Don't do it; leave Bruce come and get his check some other day, some other time.' * * *

"Q. Did he tell you anything else besides saying, 'Well, I'm going to fire you.' A. He says, 'I'm going to fire you', and says, 'Give your card to Mr. Kennon for him to write you out.' He was going to write me out, and Mr. Burton told him, 'No, don't write him out. Let him come another day and get his pay.' * * *

"Q. Did you say anything more to Mr. Burton or Mr. Kennon then? A. Well, after Mr. O. W. told me that, I say, 'I thank you' and I just turned around and went and exchanged clothes.

"Q. Did you understand what he meant when he said he was going to fire you? A. Well, the way he done, he wanted me to come back and get my check some other time, * * *

"Q. You understood he meant he was firing you, is that right? Didn't Mr. Burton just say, 'You're fired?' A. Yes, sir, he said I was fired, but he told me to come back some other time, like he was going to give me some more money. After Mr. Kennon got up to go write my check, if I was fired he could have let Mr. Kennon write my check and hand it to me. * * *

"Q. Did Mr. Burton say anything to you specifically as to whether he was going to give you a raise in pay at that time, or did he just say, 'No, you're fired'? Did he say, 'Come back and we'll talk it over', or just, 'You're fired?' A. He just told me, 'Bruce, come back another time and get your check.' * * *

"Q. Was there anything to keep you from going out there and getting your pay on Friday at the regular pay day? A. I was just waiting for Mr. O. W. to send word for me to go that he was going to give me my money. * * *

"Q. Was there anything preventing your coming out there and getting it? A. No, sir; the only thing, I was waiting for a call from him to come out, that he was going to give me a raise.

"Q. You thought he was going to call you and tell you he had given you a raise in pay? A. Yes, sir. * * *

"Q. Why did you decide to go out there on Saturday instead of going on Friday? A. I didn't want to go on Friday because I figured Mr. O. W. was going to see me there at 4:30; maybe going to tell me something. I figured by going on Saturday, I wanted to talk with him."

He testified on direct examination in part:

"Q. When you went out there on this Saturday, what were you going out there for? A. I was going to see if Mr. O. W. would give me a raise so I could go back to work and I wanted my money"; that he also wanted his clothes and tools; that he arrived at the shipyard about 6:00 a. m., and the first man he saw was the night watchman Fruge; that he had a conversation with the night watchman on the railroad track; that the offices were not open at that time; that after he had been talking with Fruge he heard someone calling his name but that he couldn't see who it was but the night watchman told him it was Mr. Mott; that Mott called him about three times; that Mott said, "Bruce, come see"; that he did not know who it was the first time but after the night watchman told him it was Mott that when Mott called him again he knew his voice;

"Q. Was 'come see' the only thing you heard him say? A. As I turned around and seen him he made a sign to come to him. He was standing on the barge"; that he did not know why Mott called him;

"Q. Did Fruge say anything after he told you it was Mott and if he did, what did he say? * * * A. He says, go see what Mott wants, maybe Mr. O. W. told him something good for you"; that after the conversation he walked toward Mott; that when he got near he saw Mott standing on the barge; that he saw no one else around the barge except Mott; that he did see Tibbetts and someone else at the back door of the carpenter shop; that Mott was on top of the barge and that he did not know whether anyone else was in the barge or not; that neither he nor Mott was smoking; that he just said good morning to Mott;

"Q. Had he had time to talk to you any before it blew up? A. No, sir.

"Q. You told him good morning and how was he doing and then what happened? A. Someone called from on the barge, and he started to pull it off, and the light, and the light cord, and that was it! The explosion went off."

After a very careful consideration of all the testimony tendered, it is our view that the evidence raised the issue that appellant was an invitee and that it is sufficient to support the jury's finding thereon. If we are correct in this view, this cause is ruled by Carlisle v. J. Weingarten, Inc., 137 Tex. 220, 152 S.W.2d 1073, 1074. The rule there stated is: " * * * that if the plaintiff was on the premises as an invitee, it was the defendant's duty to exercise ordinary care to keep its premises in a reasonably safe condition, so that the plaintiff would not be injured; and that if the defendant failed so to do, it would be liable for the damages proximately caused thereby." (The foregoing rule, although general, is applicable here.) See also Texaco Country Club v. Wade, Tex.Civ.App., 163 S.W.2d 219 (no writ history), cited with approval in Triangle Motors of Dallas v. Richmond, Tex.Sup., 258 S.W.2d 60; Texas Pac. Coal & Oil Co. v. Grabner, Tex. Civ.App., 10 S.W.2d 441; Grabner v. Texas Pac. Coal & Oil Co., Tex.Civ.App., 279 S.W. 550; Kallum v. Wheeler, 129 Tex. 74, 101 S.W.2d 225 (Com.App., Opinion Adopted); Southwestern Portland Cement Co. v. Bustillos, Tex.Civ.App., 216 S.W. 268; Id., Tex.Com.App. 211 S.W. 929; Bohn Bros. v. Turner, Tex.Civ.App., 182 S.W.2d 419 (writ er.ref.w m); 29 Tex.Jur. 434, par. 256; 65 C.J.S., Negligence, § 43 (1) p. 508 and § 43(3), p. 511; 57 C.J.S., Master and Servant, § 570, p. 308; Steiskal v. Marshall Field & Co., 238 Ill. 92, 87 N.E. 117; Vincennes Packing Corp. v. Trosper, 108 Ind.App. 7, 23 N.E.2d 624; Zeigler v. Oil Country Specialties Mfg. Co., 108 Kan. 589, 196 P. 603.

Appellee Burton says: "This appellee recognizes that in determining the question of whether Broussard was an invitee at

the time and place of his injury, the evidence must be construed most favorably to his contention. Likewise, it is recognized that it is immaterial whether he was an invitee by express invitation, or implied invitation, as in either event the duty owed to him was that of ordinary care." He further states that the only basis Broussard had for believing that he might grant him a raise was the fact that he had had a closer than average personal relationship with Burton in the past. Broussard testified that he intended to talk to O. W. Burton and "nobody else unless Mr. O. W. told somebody else to tell me something, to go back to work or give me a raise" and that "if I would not hear talk of him for me to go back to work, I want my check"; also that "if he didn't want to give me a raise I was going to get my money, sure." Thus we see that Broussard's primary purpose in going to the shipyard on Saturday morning was to see Mr. O. W. about a pay raise or to see if Mr. O. W. had left word with someone at the yard for him to go back to work with a raise in pay. Obviously, he did not know whether O. W. Burton was there when he arrived, because he asked about him from the night watchman and was informed he had gone fishing. Thus it is seen that anything said or done by Burton or his employees that could in any way be construed as an invitation consisted (1) of Burton's statement on Thursday for him to come back some other day and get his pay; (2) on Fruge's suggestion to go see what Mott wanted with him, and (3) of Mott's calling to him. We are not in complete accord with appellee's construction and think it is too restrictive.

Notwithstanding the fact that much has been written on the question as to when one is an invitee or licensee, the difficulty lies in the application of the law to each particular case, and this one is no exception. In Bagby v. Barton, 5 Cir., 131 F.2d 887, 889, we find this statement: "The general rule applicable in all jurisdictions is that approved in Bennett v. Louisville & N. R. Co., 102 U.S. 577, 584, 26 L.Ed. 235. 'The principle . * * * appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.'"

It is without dispute that Broussard had an express invitation from Burton to come back and get his pay and to that extent Broussard was an invitee. The question here is: Did the evidence tender the issue that Broussard had an implied invitation to return to the premises and see Burton in person and talk with him about getting more pay? In determining this question the jury had the right to take into consideration all of the testimony and the surrounding facts and circumstances tendered by the evidence showing the relationship that existed between Broussard and Mr. Burton. First of all, Broussard occupied a very peculiar and unusual situation with reference to his employment. His sister and niece had been in the employ of Mr. Burton's household for many years, and prior to his employment. His wife had also been an employee of the household and her employment had ended about a month before the accident happened. Broussard did the yard work, he looked after Mr. Burton's fishing boat, cleaned it up, and at times accompanied him on fishing trips. There is no evidence that there were any restrictions on Broussard as to his going near the waterfront. Our view is that the evidence is undisputed that Broussard's primary purpose in going back to the shipyard was to see Mr. Burton in person and talk with him about re-employment and a raise in pay, unless he found that Mr. Burton had left word for him with some other employee. (As we understand Burton's brief, he shares this view). If we are mistaken in this view, we think the jury had a right to draw such inference. If Broussard's intention had been solely for getting his pay and then picking up his clothes and tools, the jury would have had a right to believe and infer that he would have come on Friday, because that was the regular pay day. Did Broussard, under all the facts and circumstances surrounding his employment and work for Mr. Burton, have the right to infer from his conversation

with Burton, when he was fired, that he could come back and talk with Burton in person about rehiring him so that he could get more money? We think Broussard's action in not coming back on payday and coming early in the morning on the next day is consistent with his story that he wanted to talk to Mr. Burton about a raise in pay and re-employment, and that he believed Mr. Burton wanted him so to do. The jury had the same view. Being his yard man, looking after his boat and going fishing with him, and considering his long period of employment and the fact that Burton advanced money to him and his wife at times when they were in need, and being familiar with the tone of voice used by Burton and Burton's manner in dealing with him, we think this view has support in the testimony as a whole. This view is forcibly supported by that part of Broussard's cross-examination, where he said: "Q. You understood he meant he was firing you, is that right? Didn't Mr. Burton just say, 'You're fired'? A. Yes, sir, he said I was fired, but he told me to come back some other time, like he was going to give me some more money." Since it is undisputed that Mr. Burton did give Broussard an express invitation to come back another day and get his pay, we think that the jury had the right to infer from all the facts and circumstances that Broussard had an implied invitation to come back and approach Mr. Burton about re-employment and a raise in pay.

Being of this view, we think the court erred in setting aside the finding of the jury to Issue 6. Believing also that defendant Burton was guilty of negligence, as found by the jury, that caused the explosion and that same proximately inflicted the injuries to appellant, appellant is entitled to recover his damages, as fixed by the jury, under the authorities here cited.

But appellee Burton contends in effect that under all the facts and circumstances, Broussard was an employee at the time he was injured as a matter of law, and that since the jury found in their answer to Issue 20 that appellant was an employee at the time he received his injuries that the court should have disregarded the answer of the jury to Issue 21 to the effect that Broussard was not acting in the course of his employment at the time he received his injuries, and that his motion for judgment non obstante veredicto should have been granted and here affirmed, since it is undisputed that his employees were covered by compensation insurance. We are not in accord with this view.

Our view is that appellant was not an employee under all the facts and circumstances and we think such view is in accord with the rule announced by our Supreme Court in Lumbermen's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402; Kirby Lumber Co. v. Scurlock, 112 Tex. 115, 246 S.W. 76, and American General Ins. Co. v. Williams, 149 Tex. 1, 227 S.W.2d 788. The record here is that at the close of the testimony the court granted the Insurance Carrier's motion for directed verdict, and we have stated the recitals in the decree with reference to this matter. Notwithstanding the court's action in this behalf, the court did submit to the jury the question of whether appellant was an employee and acting in the course of his employment at the time of his injuries, and we have previously stated the jury's answers to each of these issues. It is true that neither Broussard nor the Insurance Carrier filed motions asking the court to disregard the finding of the jury to Issue 20 to the effect that Broussard was an employee, but since the jury found that Broussard was not acting in the course of his employment at the time he was injured, and since we are of the further view that the court erred in granting appellee's motion for judgment non obstante veredicto, and also erred in not granting appellant's motion for judgment on the verdict of the jury, we think the rule stated in Wright v. Longhorn Drilling Co., Tex.Civ.App., 1947, 202 S.W.2d 285 (writ ref.); Williams v. Wyrick, Tex. Sup., 245 S.W.2d 961; Hines v. Parks, 128 Tex. 289, 96 S.W.2d 970 (Com.Apps., opinion adopted); Edmiston v. Texas & N. O. R. Co., 135 Tex. 67, 138 S.W.2d 526 (Com.Apps., opinion adopted); and Hous-

ton Fire & Cas. Ins. Co. v. Walker, Tex. Sup., 260 S.W.2d 600 is not applicable here. (Stated differently, if the trial court had entertained the same views as we have here expressed, it could have granted appellant's motion for judgment and not have been in conflict with the foregoing decisions). Because of the views here expressed, we think it is our duty to follow the majority opinion of our Supreme Court in Burt v. Lochausen, Tex.Sup., 249 S.W.2d 194, point 5, and render judgment in favor of plaintiff against defendant Burton for the amount of damages fixed in the verdict.

We have carefully considered each of the counter propositions urged by defendant Burton and believe that they do not present reversible error.

Accordingly, the judgment of the trial court insofar as it rendered a take nothing judgment in favor of Texas Employers Insurance Association is affirmed. The judgment of the trial court granting motion for judgment non obstante veredicto of defendant Burton Construction & Shipbuilding Co., Inc., is reversed and judgment is here rendered in favor of Oralee Broussard against Burton Construction & Shipbuilding Co., Inc., for the sum of $50,500, with legal interest thereon from November 7, 1952, the date the original judgment was rendered in the trial court.

Accordingly, the judgment is affirmed in part and in part reversed and rendered.

On Motion for Rehearing.

Appellee Burton Construction & Shipbuilding Company, Inc., in its motion for rehearing, has assigned error to the effect that the judgment which we heretofore entered in this cause is excessive in the amount of $500, since such sum of $500 represents alleged medical expense pleaded by appellant and appellee contends that no proof was offered to show such expense and that same was not recoverable as a matter of law.

Appellant has filed a remittitur herein and concedes that he is not entitled to recover such additional sum of $500 for doctors', hospital and medical expense, and asks that the judgment heretofore entered by this court be reformed to this extent.

Accordingly, the judgment of this court is reformed in conformity with said remittitur and judgment is rendered in favor of appellant Oralee Broussard against Burton Construction & Shipbuilding Company, Inc., for the sum of $50,000, with interest thereon from November 7, 1952, at the rate of six per cent per annum.

The judgment of this court in all other respects is undisturbed and the motion for rehearing of appellee Burton Construction & Shipbuilding Company, Inc., is overruled.